**Frank MORDESOVITCH, Plaintiff,**

v.

**WESTFIELD INSURANCE COMPANY, Defendant.**

No. CIV.A. 2:02–0078.

United States District Court,
S.D. West Virginia,
Charleston Division.

Jan. 22, 2003.

---

Christopher J. Heavens, Heavens Law Offices, Charleston, Counsel for Plaintiff.

Tanya M. Kesner, Brent K. Kesner, Kesner, Kesner & Bramble, Charleston, Counsel for Defendant.

### *MEMORANDUM OPINION AND ORDER*

STANLEY, United States Magistrate Judge.

By memorandum opinion and order entered November 27, 2002, the court denied without prejudice, motions to compel filed by Plaintiff (Document 75 and 78) in which Plaintiff sought to compel Defendant to produce certain information and documents and, where a privilege was asserted by Defendant, to produce all allegedly privileged information and documents to the court for *in camera* review. (Docu-

ment # 82.) In his motions to compel, Plaintiff argued that the attorney-client privilege and work product doctrines did not apply in this first party insurance bad faith action and, as such, Defendant should be required to turn over protected information. The court rejected Plaintiff's arguments and determined that it was appropriate to apply established principles of attorney-client privilege and work product doctrine to the discovery at hand. At the time of the court's November 27, 2002, memorandum opinion and order, the court had not seen a privilege log that had been prepared by Defendant. The court directed the parties to comply with the Federal Rules of Civil Procedure related to the assertion of a privilege and imposed a schedule for the parties' compliance. Defendant filed a Second Supplemental Objection and Privilege Log of Westfield Insurance Company ("Privilege Log") on December 11, 2002, and Plaintiff responded by letter dated December 13, 2002. (Document # 85; Letter from Plaintiff's counsel dated December 13, 2002, attached hereto as Court's Exhibit 1.) By order entered December 20, 2002, following a hearing with the parties regarding the status of various matters, the court directed that Defendant submit for *in camera* review, documents as to which it has claimed a privilege(s) in the Privilege Log filed on December 11, 2002. Defendant submitted the at-issue documents to the Clerk on December 23, 2002. It is hereby **ORDERED** that the Clerk shall place the at-issue documents, attached hereto as Court's Exhibit 2, **UNDER SEAL.**

Rule 501 of the Federal Rules of Evidence provides as follows:

Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness ... shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness ... shall be determined in accordance with State law.

Pursuant to the second sentence of Rule 501, state law supplies the rule of decision in this matter alleging violations of the West Virginia Unfair Trade Practices Act, West Virginia Code § 33–11–4(9) (West 2002).

In *State ex rel. USF & G v. Canady,* 194 W.Va. 431, 460 S.E.2d 677, 684–85 (1995), the Supreme Court of Appeals of West Virginia noted that the attorney-client privilege and the work product exception are to be strictly construed. "As the attorney-client privilege and the work product exception may result in the exclusion of evidence which is otherwise relevant and material and are antagonistic to the notion of the fullest disclosure of the facts, courts are obligated to strictly limit the privilege and exception to the purpose for which they exist." *Id.* at 684. On the other hand, "[c]ourts must work to apply the privilege in ways that are predictable and certain" keeping in mind that "[t]he privilege forbidding the discovery of evidence relating to communications between an attorney and a client is intended to ensure that a client remains free from apprehension that consultations with a legal advisor will be disclosed." *Id.* at 684 (citations omitted). As the court in *USF & G* explained:

What is at stake here are two important competing policies. One policy protects the integrity and fairness of the fact-finding process by requiring full disclo-

sure of all relevant facts connected with the impending litigation. The other policy promotes full and frank consultation between a client and a legal advisor by removing the fear of compelled disclosure of information. "It is then the function of a court to mediate between them, assigning, so far as possible, a proper value to each, and summoning to its aid all the distinctions and analogies that are the tools of the judicial process."

*Id.* at 684–85 (quoting *Clark v. United States,* 289 U.S. 1, 13, 53 S.Ct. 465, 469, 77 L.Ed. 993, 999 (1933)).

■ In *USF & G,* the West Virginia Supreme Court reiterated the three elements necessary to determine whether the attorney-client privilege exists: " '(1) both parties must contemplate that the attorney-client relationship does or will exist; (2) the advice must be sought by the client from that attorney in his capacity as a legal adviser; (3) the communication between the attorney and client must be intended to be confidential.' " *Id.* at 688 (quoting *State v. Burton,* 163 W.Va. 40, 254 S.E.2d 129, 135 (W.Va.1979)).

■ A party waives the attorney-client privilege

by asserting claims or defenses that put his or her attorney's advice in issue. The classical example is where an attorney is sued by a client for legal malpractice. *See* 8 Wigmore, *supra* § 2327 at 638. A defendant also may waive the privilege by asserting reliance on the legal advice of an attorney. *Hunt [v. Blackburn],* 128 U.S. [464,] 470, 9 S.Ct. [125,] 127, 32 L.Ed. [488,] 491 [1888] (client waived privilege when she alleged as a defense that she was mislead by counsel); *Chevron Corp. v. Pennzoil Co.,* 974 F.2d 1156 (9th Cir.1992) (party's claim that its tax position was reasonable because it was based on advice of

counsel puts advice in issue and waives privilege).

*Id.* In *USF & G,* the court cautioned that the party asserting the privilege must take

the affirmative step of placing the legal advice they received in issue. \* \* \* [A]dvice is not in issue merely because it is relevant, and it does not come in issue merely because it may have some affect [sic] on a client's state of mind. Rather, it becomes an issue where a client takes affirmative action to assert a defense and attempts to prove that defense by disclosing or describing an attorney's communication.

*Id.* at 688 n. 16 (citing *Pittston Co. v. Allianz Ins. Co.,* 143 F.R.D. 66, 72 (D.N.J. 1992); *North River Ins. Co. v. Philadelphia Reinsurance Corp.,* 797 F.Supp. 363, 370–71 (D.N.J.1992)).

■ Rule 26(b)(3) of the West Virginia Rules of Civil Procedure governs the work product doctrine. It states as follows:

*Trial Preparation: Materials.* Subject to the provisions of subdivision (b)(4) of this rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impres-

sions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation. W. Va. R. Civ. P. 26(b)(3). To determine whether a document was prepared in anticipation of litigation, "the primary motivating purpose behind the creation of the document must have been to assist in pending or probable future litigation." *State ex rel. United Hospital Center, Inc. v. Bedell*, 199 W.Va. 316, 484 S.E.2d 199, 213 (1997). Consistent with the findings of the United States Court of Appeals for the Fourth Circuit in *In re Grand Jury Proceedings*, 33 F.3d 342, 348 (4th Cir.1994), the court in *USF & G* held that the work product protection is analyzed in two contexts: fact work product and opinion work product.

> "Both are generally protected and can be discovered only in limited circumstances. Fact work product can be discovered upon a showing of both a substantial need and an inability to secure the substantial equivalent of the materials by alternate means without undue hardship .... Opinion work product is even more scrupulously protected as it represents the actual thoughts and impressions of the attorney, and the protection can be claimed by the client or the attorney."

*USF & G*, 460 S.E.2d at 691 (quoting *In re Grand Jury Proceedings*, 33 F.3d at 348).

■ In *State ex rel. Allstate Ins. Co. v. Gaughan*,[1] 203 W.Va. 358, 508 S.E.2d 75, 92 (W.Va.1998), the West Virginia Supreme Court acknowledged the various approaches used in analyzing work product issues, and determined that a case-by-case approach is

> "more sound in determining whether documents in an insurance claim file were prepared in anticipation of litigation. The trial court should consider the nature of the requested documents, the reason the documents were prepared, the relationship between the preparer of the document and the party seeking its protection from discovery, the relationship between the litigating parties, and any other facts relevant to the issue."

(quoting *Askew v. Hardman*, 918 P.2d 469, 473–74 (Utah 1996)).

■ Finally, the claimant bears the burden of establishing the applicability of the attorney-client privilege or the work product exception. *USF & G*, 460 S.E.2d at 684.

The documents identified in the Privilege Log and submitted by Defendant can be grouped generally into five categories:

1. Features and/or Reserve Information (Bates stamp numbers 2, 11, 13, 35, 38–39, 41–44, 46, 49, 51–52, 108, 172[2], 213, 246, 256, 277, 280, 282, 290, 326, 423, 431, 450, 463, 464, 472 and 488). These documents or portions thereof, which consist primarily of Defendant's "Work Product Notes" and "SOCS Dropfile Cover Letters," contain features and/or reserve information. In its Privilege Log, Defendant asserts the features and reserve information contained therein is protected by the attorney-client privilege and/or the work product doctrine. Plaintiff asserts that there is a distinct likelihood that the

1. In its November 27, 2002, memorandum opinion and order, the court rejected Plaintiff's arguments related to the applicability of *Gaughan* in this first party bad faith action. Nevertheless, *Gaughan* is instructive as to the general application of the work product exception.

2. This particular document (172) and Bates stamp numbers 213, 246, 256, 282, 290, 326, 423, 431, 450, 463 and 472 were not identified by Defendant as containing reserve information, but a portion of these document do contain such information.

redacted information would show bad faith on the part of Defendant, and, as a result, should be produced. (Court's Exhibit 1, pp. 1–2, 6–7, 9, 10.)

 The court finds that the features and reserve information contained in the above Bates stamped documents is not protected by the attorney-client privilege, as there is no "communication" between client and attorney as required by *USF & G.* As to the work product exception, the court finds that the features and reserve information contained in the above-referenced documents was prepared in anticipation of litigation and reveals the " 'mental impressions, thoughts, and conclusions [of Defendant] in evaluating a legal claim.' " *Chambers v. Allstate Ins. Co.*, 206 F.R.D. 579, 590 (S.D.W.Va.2002) (quoting *Simon v. G.D. Searle & Co.*, 816 F.2d 397, 401 (8th Cir.1987)). As such, these documents are protected from disclosure pursuant to the work product exception.

 2. Fee information related to Bowles Rice McDavid Graff & Love ("Bowles Rice") and Kesner, Kesner & Bramble ("Kesner Firm") contained in "Work Product Notes" and engagement letters from Bowles Rice dated February 15, 2000 (Bates stamp numbers 37–38, 39–40, 45–46, 48, 50, 52–54, 406–407, 408–10). The information in this category consists of (1) litigation fees paid Bowles Rice in 2000; (2) litigation fees paid the Kesner Firm in 2000 and 2001; and (3) engagement letters between Bowles Rice and Defendant dated February 15, 2000. In its Privilege Log, Defendant generally asserts that the above-referenced documents are protected by the attorney-client privilege and the work product doctrine. Plaintiff argues that the engagement letters are discoverable and will likely contain relevant and admissible evidence to prove that Defendant improperly exerted leverage on Bowles Rice in an attempt to influence Bowles Rice in a manner which placed Defendant's interests above Plaintiff's. (Court's Exhibit 1, p. 8.)

 Generally, "neither the identity of a client nor the fees that the client pays is within the attorney-client privilege." Franklin D. Cleckley, Handbook on Evidence for West Virginia Lawyers, ¶ 5–4(E)(2)(b) (3d ed.1994) (citing *United States v. (Under Seal)*, 774 F.2d 624, 628 (4th Cir.1985)). In *In re Grand Jury Matter*, 926 F.2d 348, 352 (4th Cir.1991), the United States Court of Appeals for the Fourth Circuit acknowledged that attorney fee arrangements ordinarily do not reveal confidential professional communications between attorney and client and, as such, are not generally protected by the attorney-client privilege. Defendant has not made the requisite showing that the fee information contained in the "Work Product Notes" or the engagement letters are protected by the attorney-client privilege. Likewise, the work product doctrine does not preclude production of the above-referenced documents, as Defendant has not established that the documents were prepared in anticipation of litigation, i.e., "the primary motivating purpose behind the creation of the document [was not] to assist in pending or probable future litigation." *Bedell*, 484 S.E.2d at 213. Instead, the documents at issue were prepared "in the ordinary course of . . . business" and are entitled to no protection. *Id.*

3. (A) "Work Product Notes" (Bates stamp numbers 11,[3] 13, 15, 17, 20, 25–28,

---

**3.** In Defendant's Privilege Log, Defendant refers to a range of pages from 11–54 and 275–81. However, some pages within this range were produced in their entirety and are not at issue. The court has listed those Bates stamp numbered documents produced to the court for *in camera* review and about which a dispute exists as to the applicability of the attor-

35–39, 41–48, 50–53, 278–80, 488); and (B) Internal correspondence and communications at Westfield (Bates stamp numbers 172, 213, 246, 256[4], 282, 290, 326, 423, 431, 450, 463, 472).

## A. "Work Product Notes."

These documents[5] consist of redacted and/or completely withheld "Work Product Notes" of Defendant dated January 14, 2000, January 17, 2000, January 19, 2000, February 1, 2000, February 15, 2000, February 24, 2000, February 28, 2000, March 27, 2000, March 29, 2000, April 4, 2000, April 26, 2000, May 11, 2000, May 12, 2000, May 28, 2000, June 1, 2000, June 2, 2000, June 6, 2000, June 9, 2000, June 12, 2000, June 26, 2000, June 30, 2000, July 7, 2000, August 11, 2000, October 20, 2000, November 8, 2000, November 13, 2000, July 3, 2001, and November 7, 2001.

In its Privilege Log, Defendant asserts the attorney-client privilege and work product exception as grounds for redacting and/or not producing the above information. Plaintiff argues that there is a distinct likelihood that the redacted portions of the above-referenced documents would tend to show that Defendant's denials of Plaintiff's allegations are made in bad faith and contradicted by Defendant's own documents. (Court's Exhibit 1, pp. 2, 6–7, 10–11.)

Without revealing their substance, the "Work Product Notes" enumerated above begin with filing of the underlying lawsuit in January of 2000, and reveal the progress of the underlying case (including, in some instances, the thoughts and mental impressions of Westfield and its counsel, the Kesner Firm, related to various issues that arose in the underlying case) through its conclusion and thereafter through November 7, 2001. The "Work Product Notes" were authored primarily by the claims adjuster, Erik Sikorski, but also by his superiors and others employed by Defendant.

There is no doubt that the majority of the "Work Product Notes" at issue (those dated from January 13, 2000, through November 13, 2000, just before the underlying action was dismissed, i.e., Bates stamp numbers 11, 13, 15, 17, 20, 25–28, 35–39, 41–48, 50–52, 278–80, 488, but not 53) were prepared in anticipation of litigation as to the underlying action[6] filed by Plaintiff against Defendant and others. The underlying action was filed on June 11, 2000, in the Circuit Court of Kanawha County, West Virginia against the underinsured motorist who hit and killed Plaintiff's pedestrian son, the bar that served alcohol to the underinsured motorist, and Defendant[7], who provided Plaintiff underinsured motorist coverage. Defendant retained

ney-client privilege and work product doctrine.

**4.** All of the documents identified here, with the exception of Bates stamp number 256, are entitled "SOCS Dropfile Cover Letter."

**5.** To the extent the "Work Product Notes" and "SOCS Dropfile Cover Letters" contain features and reserve information, the court addresses protection of this information under subpart 1 of this decision.

**6.** The court culled the pertinent procedural history of the underlying action from a number of sources.

**7.** Plaintiff twice moved to amend the complaint in State court, once to file a declaratory judgment action against Defendant and a second time to allege a bad faith claim. Although the motion to amend the complaint to allege bad faith was granted by the State court, Plaintiff never filed the amended complaint alleging bad faith. Instead, he later filed a second lawsuit in State court alleging bad faith, which action was removed to this court by Defendant.

the Kesner firm to represent it in the underlying action. (Westfield Insurance Company's Response to Plaintiff's Motion to Compel ("Def.'s Resp.") at 2 (Document # 79).) On August 14, 2000, Plaintiff and Defendant entered into a settlement agreement in which Defendant paid the $300,000 limits of its underinsured motorist coverage to Plaintiff, and Plaintiff signed a "Release, Settlement and Subrogation Agreement." The Agreement provided that "Westfield shall be subrogated to the extent of its payment of underinsurance and medical payments to [Plaintiff]." Almost from the beginning of the underlying suit, Plaintiff and Defendant were at odds over several issues, including issues related to residency and subrogation. The dispute as to the subrogation issue continued after Plaintiff and Defendant settled.

After settling with Defendant, Plaintiff continued his action against the bar and by virtue of a settlement around October of 2000, ultimately recovered the full limits of the liability insurance coverage available to the bar. At a hearing on November 27, 2000, to approve the settlement and dismiss the case, Defendant requested additional time to decide whether it believed that Plaintiff was made whole by the combined insurance settlements, such that it would waive its right to subrogation. As a result, the court decided to forego ruling on the various legal positions and scheduled a hearing on December 11, 2000, at which time Defendant must show good cause as to why the entire amount of the settlement monies should not be paid to Plaintiff. (Def.'s Resp., Exhibit G.) The hearing never occurred because on November 28, 2000, Defendant waived its subrogation rights. (Def.'s Resp. at 5.) On December 14, 2001, Plaintiff filed the instant bad faith action in the Circuit Court

of Kanawha County, West Virginia, and Defendant removed the case to this court on January 28, 2002.

With the exception of entries on Bates stamp number 53, the above-cited "Work Product Notes" are dated January of 2000, through November of 2000, and were created during the underlying litigation. Clearly, "the primary motivating purpose behind the creation of the document[s] was to assist in pending ... litigation." *Bedell,* 484 S.E.2d at 213. Had the above-referenced documents been before the court in the context of the underlying litigation, the conclusion that they were prepared in anticipation of litigation is certain.[8]

 The court must further determine whether the work product protection, to the extent it appropriately applies as to documents prepared in the underlying litigation, extends to this subsequent bad faith litigation. The court finds that in all the instances where work product exists as to the underlying litigation (see analysis below), the protection should extend to the instant case. The West Virginia Supreme Court in *USF & G* addressed in dicta the issue of whether the work product exception evaporates when the litigation for which the document was prepared ends or whether it extends to subsequent litigation. *USF & G,* 460 S.E.2d at 691. The West Virginia Supreme Court concluded, based on United States Supreme Court precedent, that the protection generally applies in subsequent litigation. The West Virginia Supreme Court went on to recognize that the majority of federal courts, including the United States Court of Appeals for the Fourth Circuit, have found that the protection applies in subsequent litigation. The West Virginia Supreme Court noted that some courts have applied

---

8. The court addresses below, whether the remaining requisites of the work product doctrine have been satisfied as to these documents.

the protection to "closely related" subsequent litigation, while others, including the Fourth Circuit, have taken a broader view by finding the privilege applies to all subsequent litigation whether or not related. *Id.* In *USF & G,* the West Virginia Supreme Court determined that the documents at issue in that case satisfied both alternatives, making it unnecessary to decide between the two. As in *USF & G,* the subsequent bad faith litigation between Plaintiff and Defendant is closely related to the underlying lawsuit. Indeed, the alleged actions of Defendant in the underlying action are the very basis for Plaintiff's claims in the instant action and, as such, they could not be more closely related.

To the extent the West Virginia Supreme Court's directive in *USF & G* is merely dicta and, therefore, lacking the force of an adjudication, there is other support for extending the work product protection to this subsequent bad faith litigation. In *Bartlett v. State Farm Mutual Automobile Ins. Co.,* 206 F.R.D. 623 (S.D.Ind.2002), the United States District Court for the Southern District of Indiana addressed the issue in a context very similar to the instant case. In *Bartlett,* an insured filed suit against his insurer for payment of underinsured motorist proceeds under his policy and eventually obtained a verdict in his favor. As a result of the verdict, the insurer paid the underinsured motorist policy limits. The insured filed suit against his insurer again, this time alleging bad faith claims related to failure to tender policy limits on the underinsured motorist policy. *Id.* at 625. In the bad faith action, the insurer sought protection of correspondence between the insurer and its counsel in the underlying suit, an interrogatory summary drafted by counsel in the underlying action and draft responses to the plaintiff's interrogatories, among others. The insurer asserted the

attorney-client privilege and work product protection. *Id.* at 626.

The court in *Bartlett* determined that the correspondence between the insurer and its trial counsel in the underlying case was protected by the attorney-client privilege and that the insured could obtain much of the information through less intrusive means. *Id.* at 627. The court went on to find that the information contained in the claims file was protected by the work product doctrine. The court concluded that the insurer had presented "sufficient evidence that the documents in question were prepared in anticipation of litigation for [the insured's] first case tried in state court and not in the ordinary course of business." *Id.* at 629.

The court in *Bartlett* reached its conclusion based on a number of considerations, all of which exist in the instant case and further counsel in favor of a finding that the documents at issue were prepared in anticipation of litigation. The court in *Bartlett,* quoting *Kujawa v. Manhattan Nat. Life Ins. Co.,* 541 So.2d 1168, 1169 (Fla.1989), acknowledged that the relationship between an insured and an insurer in a first party bad faith action is " 'adversarial, not a fiduciary, relationship ... and that the legislature in creating the bad faith cause of action did not evince an intent to abolish the attorney-client privilege and work product immunity.' " *Bartlett,* 206 F.R.D. at 629.

Similarly, in *Gaughan,* the West Virginia Supreme Court recognized the potentially adversarial nature of the relationship between insurer and insured in a first party bad faith action:

> Because the interests of the insured [sic; insurer] and insured may in fact be inconsistent in a first-party bad faith action, we decline to decide the extent to which the attorney-client privilege/work

product rules apply to the claim file of an insured in a first-party bad faith action against an insured [sic; insurer]. *Gaughan,* 508 S.E.2d at 87 (citation omitted). In fact, it was this language that the court found instructive in its November 27, 2002, memorandum opinion and order in determining that traditional established principles of the attorney-client privilege and work product doctrine applied in the instant first party bad faith action. (*See* Document # 82, pp. 13–16.)

The court in *Bartlett* noted a decision from the Middle District of North Carolina, in which the court recognized that " '[w]hile arguably it may be more difficult to prove a claim of bad faith failure to settle without examining an insurance company's claims file, that does not mean it is impossible.' " *Bartlett,* 206 F.R.D. at 629 (quoting *Ring v. Commercial Union Ins. Co.,* 159 F.R.D. 653, 657 (M.D.N.C. 1995)). The court in *Ring* reasoned that Rule 11 requires the plaintiff to have a reasonable basis in fact to bring the claim. In addition, the *Ring* court noted that plaintiff "could 'thoroughly depose and examine the defendants' adjuster to find out all of his actions and decisions leading to the denial of the claim.' " *Bartlett,* 206 F.R.D. at 629 (quoting *Ring,* 159 F.R.D. at 657).

The court is sensitive to the challenges Plaintiff may face in proving bad faith without access to the whole of every document in the claims file. However, as the court in *USF & G* pointed out "[i]n clear language, Rule 26 provides that privileged matters, although relevant, are not discoverable. As a result of this rule, many documents that could very substantially aid a litigant in a lawsuit are neither discoverable nor admissible as evidence." *USF & G,* 460 S.E.2d at 687. Furthermore, there are other means through which Plaintiff may prove his case. The

court has allowed the depositions of counsel in this matter and Plaintiff has deposed the claims adjuster, Mr. Sikorski, among others.

■ Based on the above reasoning, the court concludes that the above-referenced documents were prepared in anticipation of litigation. The court further finds that the following documents are completely protected because they constitute opinion work product embodying theories and opinions about the litigation: Bates stamp numbers 11, the second sentence beginning with "He", but not the first sentence beginning with "The lawsuit"; 13; 15; 20; 25; 26; 27; 35, the March 27, 2000, entry, but not the March 29, 2000, entry; 36; 37; 38; 39, except for the entry on May 12, 2000; 41; 42–43, but not the second, third, fourth and fifth sentences of the entry on June 2, 2000, beginning with "Also"; 44; 45; 46; 48, but not the sentences in the entry on July 7, 2000, beginning with "Please" and ending with "Erik;" 50, but not the first sentence of the entry on October 20, 2000, beginning with "Spoke"; 51; 52; 53; 278, but not the entry on March 29, 2000 (this page duplicates entries on 35 and 36); 279–80, except for the entry on May 12, 2000 (this page duplicates entries on 37, 38 and 39); and 488.

■ With respect to the remaining documents not entitled to full protection, the court must determine whether Plaintiff has a substantial need for them, taking into account their relevance and importance and the availability of the facts from other sources. The court finds that Plaintiff does not have a substantial need for the documents, Bates stamped or otherwise identified as follows: 11, the first sentence beginning with "The lawsuit;" 17; 28; 35, the March 29, 2000, entry; 39, the entry on May 12, 2000; 42–43, the second, third, fourth and fifth sentences of the entry on June 2, 2000, beginning with

"Also;" 47; 48, the July 7, 2000, entry beginning with "Please" and ending with "Erik;" 50, the first sentence of the entry on October 20, 2000, beginning with "Spoke;" 278, the March 29, 2000, entry (this entry duplicates an entry on 35); 279–80, the entry on May 12, 2000 (this entry duplicates an entry on 39). The documents simply do not contain information that is of any relevance or importance in the instant case and, as such, the court finds that Plaintiff lacks the substantial need necessary for their disclosure.

■ As to the remaining "Work Product Notes" (Bates stamp number 53) which postdate the resolution of the underlying lawsuit in November of 2000, the court finds that the entries in the "Work Product Notes" dated July 3, 2001, and November 7, 2001, also were prepared in anticipation of litigation. Plaintiff moved to amend the underlying State court action to allege a bad faith action, and the State court granted this motion at a hearing on November 27, 2000, as memorialized in its order entered December 18, 2000. (Def.'s Resp., Exhibit G.) Although Plaintiff never filed the third amended complaint, and instead, filed the instant action in State court, which Defendant removed, Defendant was on notice as to Plaintiff's intention to file a bad faith action by November of 2000, if not earlier. Thus, the court concludes that Bates stamp number 53 was prepared in anticipation of litigation. The court further finds that the entries on July 3, 2001, and November 7, 2001, contain opinion work product embodying theories and opinions about the litigation and, therefore, are completely protected from production.

Finally, the court finds no indication that Defendant placed in issue any attorney-client communications contained in the "Work Product Notes" and otherwise protected by either the attorney-client privilege or the work product doctrine. Plaintiff makes no mention of this in his letter dated December 13, 2002, responding to the Privilege Log. There is brief mention in Plaintiff's first motion to compel that Defendant placed the advice of counsel in issue by virtue of its response to an interrogatory. (Document # 75, p. 10.) The court disagrees and has seen no additional indication that Defendant affirmatively placed the advice of counsel in issue. Notably, the court explained in *USF & G* that the test for determining waiver of the attorney-client privilege is a stringent one, requiring that the party asserting the privilege take

> the affirmative step of placing the legal advice they received in issue. * * * [A]dvice is not in issue merely because it is relevant, and it does not come in issue merely because it may have some affect [sic] on a client's state of mind. Rather, it becomes an issue where a client takes affirmative action to assert a defense and attempts to prove that defense by disclosing or describing an attorney's communication.

*USF & G*, 460 S.E.2d at 688 n. 16 (citing *Pittston*, 143 F.R.D. at 72; *North River*, 797 F.Supp. at 370–71). The court cannot conclude that Defendant placed protected communications or documents in issue.

B. "SOCS Dropfile Cover Letter."

Many of the "SOCS Dropfile Cover Letters" contain information duplicated in the "Work Product Notes." Mr. Sikorski corresponded with other employees of Defendant on various issues related to the underlying litigation. His "Work Product Notes" reflect this correspondence and its content, while the "SOCS Dropfile Cover Letters" appear to be the actual document sent to various other employees of Defendant. As a result, the court rules as follows:

(1) Bates stamp number 213 contains information duplicated in Bates stamp number 52, which the court found to be protected;

(2) Bates stamp number 246 contains information duplicated in Bates stamp number 48, which the court found to be protected;

(3) Bates stamp number 290 contains information duplicated in Bates stamp number 36, which the court found to be protected; and

(4) Bates stamp number 450 contains information duplicated in Bates stamp number 17, which the court found to be protected.

■ The court further finds that in at least two instances, Defendant seeks work product protection for documents, the content of which was disclosed in the "Work Product Notes." As a result, any protection afforded these documents has been waived and, they must be produced. In particular,

(1) The content of Bates stamp number 282 was produced at Bates stamp number 37; and

(2) The content of Bates stamp number 326 was produced at Bates stamp number 28.

■ As to Bates stamp numbers 172 and 256, a "SOCS Dropfile Cover Letter" with handwritten notes, and handwritten notes on a features and reserve document dated June 1, 2000, the court finds, consistent with its reasoning as to the "Work Product Notes," that these documents were prepared in anticipation of litigation. Furthermore, they contain theories and opinions about the litigation and are completely protected from production.

As to Bates stamp numbers 423, 431, 463 and 472, the court finds that these documents were prepared in anticipation of litigation, but that they do not contain opinions and theories about the litigation. Furthermore, the documents do not contain information that is of any relevance or importance in the instant case and, as such, the court finds that Plaintiff lacks the substantial need necessary for their disclosure.

4. Correspondence and communications between Westfield and counsel at the Kesner Firm (Bates stamp numbers 64, 84, 101, 160, 161, 162, 163, 164, 173–74, 211–12, 214–15, 248, 291–92, 297, 299, 370, 405, 411, 432, 451, 452, and 475).

■ A. Bates stamp numbers 160, 161, 162 and 163. These documents, one letter and one fax cover sheet from the Kesner Firm to Defendant and two fax cover sheets from Defendant to the Kesner Firm, are dated after Plaintiff filed the instant bad faith suit. Bates stamp number 160 is a confidential communication containing legal advice regarding the instant lawsuit, and, therefore, is protected by the attorney-client privilege and not subject to production. Bates stamp numbers 161, a fax cover sheet, contains no communication and is not protected by the attorney-client privilege. With respect to work product, Bates stamp number 161 was prepared in anticipation of litigation (it appears to be the fax cover sheet for the letter dated January 21, 2002 (Bates stamp number 160)), but does not contain opinions and theories about the litigation. The documents simply do not contain information that is of any relevance or importance in the instant case and, as such, the court finds that Plaintiff lacks the substantial need necessary for their disclosure. Bates stamp numbers 162 and 163 do not fall within the attorney-client privilege, as they do not seek or contain legal advice. Bates stamp numbers 162 and 163 were prepared in anticipation of litigation, but they do not contain opinions and theo-

ries about the litigation. The court further finds that Plaintiff does not have a substantial need for these documents; they simply do not contain information that is of any relevance or importance in the instant case.

B. Bates stamp numbers 64, 84, 101, 164, 173–74, 211–12, 214–15, 248, 291–92, 297, 299, 370, 405, 411, 432, 451, 452, and 475. The remaining documents consist of letters from Defendant to the Kesner Firm or visa versa dated prior to the institution of the instant litigation and related to matters in the underlying litigation.

The following documents are protected by the attorney-client privilege, as they are confidential attorney-client communications, which seek or provide legal advice: Bates stamp numbers 173–74, 211–12, 291–92, 297, 299, 370, 405, 411, 432, 451, 452, and 475.

The remaining documents not protected by the attorney-client privilege, Bates stamp numbers 64, 84, 101, 164, 214–15, and 248, were created in anticipation of the underlying litigation and do not contain opinions and theories about the litigation. The court further finds that Plaintiff does not have a substantial need for these documents; they simply do not contain information that is of any relevance or importance in the instant case.

■ 5. Certificate of mailing (Bates stamp numbers 538–39). Defendant only provided Bates stamp number 539 to the court. This document is a certificate of mailing on which all names and addresses except for Plaintiff's have been redacted. Defendant does not assert any sort of privilege for this document. Plaintiff asserts that the document should be produced because it "may lead to other Westfield insureds who have been treated unfairly and/or illegally by Westfield. The plaintiff will agree to confidentiality if the information is produced and will agree to make no

attempt to contact any Westfield insureds without a court order stating that the plaintiff may contact Westfield insureds based upon the 'certificate of mailing' information." (Court's Exhibit 1, p. 11.) Pursuant to Rule 26(b)(1) of the Federal Rules of Civil Procedure, the certificate of mailing information is not relevant to the claim or defense of any party, nor does the court find good cause for the disclosure of such information. Plaintiff has not alleged a class action or pattern and practice conduct of any kind and information related to other claims handled by Defendant is not discoverable pursuant to Rule 26(b)(1).

Accordingly, it is hereby **ORDERED** that by the close of business on **February 11, 2003,** Defendant shall produce to Plaintiff, the following:

(1) At Bates stamp numbers 37–38, the litigation expenses entry on May 8, 2000 (Note Number 97), beginning at the bottom of 37 and continuing on 38;

(2) At Bates stamp numbers 39–40, the litigation expenses entry on May 15, 2000 (Note Number 101), beginning at the bottom of 39 and continuing on 40;

(3) At Bates stamp numbers 45–46, the litigation expenses entry on June 12, 2000 (Note Number 128), beginning at the bottom of 45 and continuing on 46, but not the remaining entries on June 12, 2000;

(4) At Bates stamp number 48, the last line on that page that begins "Mailed to;"

(5) At Bates stamp number 50, the litigation expenses entry on August 30, 2000 (Note Number 162);

(6) At Bates stamp numbers 52–54, the litigation expenses entries on December 20, 2000 (Note Number 174), January 5, 2001 (Note Number 175), and November 7, 2001 (Note Number 178);

(7) At Bates stamp number 282, the top half of the page, but not the bottom half of

the page beginning with "Reserve Information;"

(8) At Bates stamp number 326; the top half of the page, but not the bottom half of the page beginning with "Reserve Information;"

(9) Bates stamp numbers 406 and 407; and

(10) Bates stamp numbers 408, 409 and 410.

The Clerk is requested to mail a copy of this Memorandum Opinion and Order to all counsel of record and post this published opinion at *http://www.wvsd.uscourts.gov.*