Paul L. NICHOLAS, Shaunet S. Nicholas and Paul L. and Shaunet S. Nicholas, as Parents and Next Friends of Erin Michelle Nicholas, an infant under the age of eighteen years, Plaintiffs,

v.

BITUMINOUS CASUALTY CORPORATION, Defendant.

No. CIV.A. 1:03CV276.

United States District Court, N.D. West Virginia.

Feb. 24, 2006.

Ancil C. Ramey, Andrew L. Paternostro, Paul A. Konstanty, Steptoe & Johnson, PLLC, Martin R. Smith, Jr., Smith & Thompson, Charleston, WV, for Plaintiffs.

Amanda J. Davis, James D. McQueen, Jr., McQueen & Murphy, LC, Charleston, WV, for Defendant.

### ORDER SUSTAINING DEFENDANT'S OBJECTION TO THE MAGISTRATE JUDGE'S NOVEMBER 15, 2005 OR-DER/OPINION

KEELEY, District Judge.

Pending before the Court is the defendant, Bituminous Casualty Corporation's ("Bituminous"), objection to Magistrate Judge John S. Kaull's November 15, 2005 Order/Opinion. That Order/Opinion required Bituminous to produce, within ten (10) business days, any and all reserve information actually communicated to Bituminous as part of "the investigation and defense of the underlying tort claim." On November 30, 2005, Bituminous objected; on December 14, 2005, the plaintiffs, Paul and Shaunet Nicholas ("the Nicholases"), responded; and, on December 23, 2005, Bituminous replied. Thereafter, without leave of Court, the Nicholases filed a sur-reply on December 27, 2005, that prompted Bituminous to file an objection or, in the alternative, a sur-response on January 4, 2006. Because both parties had the opportunity to fully brief their positions and set forth substantial arguments in their respective sur-reply and sur-response, the Court will consider these pleadings in reviewing the magistrate judge's order/opinion. However, the Court admonishes both parties for failing to request leave to file these briefs and instructs them to follow the local rules of this Court in future filings in this case. Further,

for the following reasons, the Court SUS-TAINS Bituminous' objection to the magistrate judge's Order/Opinion.

## I. Background

### A. Underlying Facts

The Nicholases' amended complaint alleged that Bituminous had committed numerous separate and discrete violations of the West Virginia Unfair Trade Practices Act ("UTPA")and the Insurance Commissioner's regulations in the processing and litigating of their claims, so as to establish a general business practice. These alleged violations included, but were not limited to, failing to acknowledge coverage under Coverage C of its "Commercial Liability Coverage Form," failing to attempt in good faith to effectuate a prompt, fair and equitable settlement of their claims after the liability of its insureds became reasonably clear, and retaining the firm of Bastien & Lacy, L.C., which engaged in conduct that assertedly was not the result of the firm's independent, professional discretion, but was directed by or otherwise relied upon or ratified by Bituminous.

█ Significantly, in its answer, Bituminous asserted the "advice of counsel" defense regarding the services provided by the firm of Bastien & Lacy, L.C. "in the investigation and defense of the insureds' interests in the underlying tort claim." [1] It also asserted the "advice of counsel" defense regarding its alleged failure to acknowledge coverage under Coverage C of the "Commercial Liability Coverage Form."

During discovery, the Nicholases sought information from Bituminous concerning the amount reserved for their underlying claims, but Bituminous refused to disclose that amount, citing the work-product doctrine. When the Nicholases also sought documents related to Bituminous' loss reserve amounts, Bituminous filed a privilege log that identified the reserve documents but withheld them, again based on the work-product doctrine.

After the Nicholases moved to compel discovery of Bituminous' reserve information, Magistrate Judge John S. Kaull held a hearing on their motion and conducted an *in camera* review of the reserve documents.

### B. The Magistrate Judge's Order/Opinion

In the order/opinion that followed his review of the underwriting file, Magistrate Judge Kaull identified the disputed issues as: (1) whether Bituminous' loss reserve documents were discoverable; (2) whether Bituminous' underwriting file was discoverable; (3) whether Bituminous had waived either the attorney/client privilege or work-product doctrine concerning its communications with counsel; and (4) whether plaintiffs had a sufficient basis for an award of sanctions. His opinion ordered Bituminous to produce all documents in that file concerning "other incidents involving overworked Northeastern employees and whether [Bituminous] actively participated in efforts to prevent such information from being disclosed in discovery in the underlying action."

With respect to whether Bituminous had waived its rights under either the attorney-client privilege or work-product doctrine, Magistrate Judge Kaull first noted that Bituminous had expressly asserted the "advice of counsel" defense in two areas: (1) the opinions and services that the law firm of Bastien & Lacy had provided concerning whether there was coverage under Coverage C of the "Commercial Liability Coverage Form;" and (2) the opinions and services the law firm had provided "in the investigation and defense of the insureds' interests in the underlying tort claim." From that, he concluded that a client relying on the defense of "advice of counsel" waives its attorney-client privilege with respect to the entire subject matter of

---

1. An insurance third-party bad faith case is an inquiry into the propriety of an insurer's actions vis-a-vis an injured party. To a certain degree, such propriety is determined by the insurer's state of mind in taking (or not taking) some action. Thus, the advice-of-counsel defense was developed as a way for the insurer to show the good faith or proper state of mind it had in making a decision affecting an insured or injured party. Reliance, in good faith, on the advice of competent counsel may be used in the defense of allegations that an insurer's conduct was done in bad faith. *See generally, Shamblin v. Nationwide Mut. Ins. Co.*, 183 W.Va. 585, 396 S.E.2d 766 (1990).

the waiver. Consequently, he found that Bituminous had waived any privileges as to opinions provided by any attorney regarding whether the Nicholases' claims were covered under Coverage C of the "Commercial Liability Coverage Form," and also regarding the investigation and defense of the insureds' interests in the underlying tort claim. Accordingly, he ordered Bituminous to produce any information it possessed on these issues that had been communicated to it by any attorney.

On the key issue of the loss reserve information sought by the Nicholases, Magistrate Judge Kaull found that such information had been prepared "in anticipation of litigation" and contained attorney mental impressions, thoughts and conclusions; he therefore concluded that such information was protected by the opinion work-product doctrine, but held that by asserting the "advice of counsel" defense regarding "the investigation and defense of the underlying tort claim," Bituminous had waived the work-product privilege as to any information communicated to it by counsel.

Bituminous' objection to the magistrate judge's decision is narrowly focused; it does not seek to withhold its attorneys' work regarding loss reserve documents, but only the work of its non-attorney line claim handlers and managers who set up or changed those loss reserves. According to Bituminous, such information does not satisfy the critical condition of involvement or preparation by underlying defense counsel, or the participation of in-house attorneys acting in the capacity of legal advisers, and, therefore, falls outside the scope of its waiver.

Notwithstanding this argument, Bituminous further asserts that its loss reserve information is irrelevant to the Nicholases' claims. Alternatively, it contends that disclosure of such information would prejudice it and violate West Virginia's public policy favoring the good faith reserving of money by insurers.

The Nicholases dismiss Bituminous' reliance on the work-product doctrine, arguing it has no application to loss reserve documents prepared in the ordinary course of business or after the underlying personal injury action was filed on November 11, 2003. They contend that the loss reserve information they seek is highly probative of their claim that Bituminous failed to attempt in good faith to settle their claims.

## II. STANDARD OF LAW

Rule 72 of the Federal Rules of Civil Procedure, which governs the Court's review of the magistrate judge's order, states that "[t]he district judge to whom the case is assigned shall consider such objections and shall modify or set aside any portion of the magistrate judge's order found to be clearly erroneous or contrary to law." Consequently, there are three issues that this Court must consider:

(1) Whether the magistrate judge's order/opinion concerning the discoverability of the reserve information was contrary to law because he failed to determine whether the reserve information was relevant to the third-party bad faith claims asserted by the plaintiffs;

(2) Whether the magistrate judge's finding that the loss reserve information is protected by the work-product doctrine is clearly erroneous and contrary to the law; and

(3) If Bituminous' loss reserve information is protected by the work-product doctrine, whether the magistrate judge's finding that the defendant waived such protection by asserting the "advice of counsel" defense regarding the investigation and defense of the insureds' interests in the underlying tort claim is clearly erroneous and contrary to the law.

## III. ANALYSIS

### A. Relevancy of Reserve Information

 Recently, in *State of West Virginia ex rel Erie Property & Casualty Company v. The Honorable James P. Mazzone, Judge of the Circuit Court of Ohio County, and Elizabeth Murfitt,* No. 32777, 218 W.Va. 593, 625 S.E.2d 355 (W.Va.2005), the West Virginia Supreme Court of Appeals considered whether reserve information is discoverable in a third-party bad faith action. Although the

holding in *Erie* is not binding on the Court[2], a review of the case establishes that it is persuasive authority, particularly because Rules 26(b)(1) and (3) of the West Virginia Rules of Civil Procedure are patterned after, and identical to, Rules 26(b)(1) and (3) of the Federal Rules of Civil Procedure.

The plaintiff had filed a third-party bad faith action against Erie Property & Casualty Company ("Erie") due to Erie's handling of a motor vehicle claim involving Erie's insured. During discovery, the plaintiff had sought a copy of Erie's claims file. Based on its belief that its reserve information was protected as opinion work-product, Erie had produced a redacted version of its claims file and provided a detailed privilege log. The plaintiff then had moved to compel production of all reserve information and the trial court had ordered Erie to produce the reserve documents.

Erie petitioned the West Virginia Supreme Court of Appeals to prohibit enforcement of the circuit court's order. That court, however, failed to reach Erie's work-product argument because it found "a more fundamental weakness" in the lower court's treatment of the discovery request. *Ex Rel Erie v. Mazzone*, 218 W.Va. 593, 625 S.E.2d 355, 357–58. After noting that the trial court's order contained no findings of fact or conclusions of law concerning the relevancy of the reserve information, the court stated that relevancy is a threshold discovery issue and held that "it is only after information is determined to be relevant that consideration is given to whether the information is subject to exclusion based upon the absolute or conditional privilege of attorney-client privilege communications or work-product information respectively." *Id.*

Rule 26(b)(1) of the Federal Rules of Civil Procedure states that parties may obtain discovery regarding any matter, not privileged, that is relevant to the subject matter involved in the case. Although the West Virginia Supreme Court of Appeals found that relevance should be determined before the issue of privilege is addressed, many courts follow the express language of Fed.R.Civ.P. 26(b)(1) and determine whether specific information is privileged before determining its relevancy. *See, e.g. Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 332 F.3d 976 (6th Cir.2003).

Regardless of when a court decides if information is privileged, ultimately it must determine whether the information sought is relevant to the subject matter of the case before finding it is discoverable. Thus, to conclude that reserve information is discoverable, a court must find that such information is not privileged *and* is relevant to the issues in the case.

Here, the magistrate judge initially conducted a work-product analysis under Fed. R.Civ.P. 26(b)(3), from which he concluded that Bituminous' loss reserve documents in fact were protected by the work-product doctrine. Despite the privilege, he then concluded that the loss reserve information in this case was discoverable because Bituminous had waived the work-product privilege by asserting the "advice of counsel" defense regarding "the investigation and defense of the insureds' interests in the underlying tort claim." Unfortunately, he never determined whether such information was relevant to the issues raised in this case. Based on the analysis that follows, this Court concludes that the loss reserve information sought by the plaintiffs is relevant to the issues in their case.

1.

Setting reserves is a method of managing litigation in which attorneys, claims adjusters and/or line personnel compile their mental impressions and opinions concerning the substance of the litigation as well as the cost of

**2.** In *Ex Rel Erie Property v. Mazzone*, the West Virginia Supreme Court of Appeals interpreted Rule 26 of the West Virginia Rules of Civil Procedure. In a diversity case federal courts apply federal law to resolve work-product privilege claims and state law to resolve attorney-client privilege claims. *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947); *Baker v. General Motors Corp.*, 209 F.3d 1051, 1053 (8th Cir.2000); *Frontier Refining, Inc. v. Gorman-Rupp. Co.*, 136 F.3d 695, 702 (10th Cir.1998); *United Coal Companies v. Powell Construction Co.*, 839 F.2d 958 (3rd Cir.1988). This Court, therefore, will apply Rule 26 of the Federal Rules of Civil Procedure when deciding the work product dispute in this case.

litigation. *Rhone–Poulenc Rorer Inc., v. Home Indemnity Company,* 139 F.R.D. 609, 615 (E.D.Pa.1991). Specifically, when setting a reserve, attorneys and claims personnel not only assess the value of the claim based on the available evidence and the strengths and weaknesses of the claim, but also take into consideration the probability of an adverse judgment, the jurisdiction, and the fees and expenses that may be incurred in defense of the claim. *Ex Rel Erie v. Mazzone,* 218 W.Va. 593, 625 S.E.2d 355, 358–59.

In *Erie,* the West Virginia Supreme Court declared that when determining whether information sought through discovery is relevant a court must determine how the information requested bears substantively on the issues in the case. *Id.* at 357–58. It noted that other jurisdictions had concluded that reserve information was neither subject to automatic disclosure nor automatic protection from discovery; thus, while West Virginia insurance statutes demand that insurance companies set loss reserves, the manner in which each company arrives at the figure depends on the method an insurance company utilizes to set its loss reserves. *Id.* at 358–59.

The methods by which an insurance company sets reserves in a particular claim have a direct bearing on whether reserve amounts are relevant in a third-party bad faith case. *Id.* Relevancy of reserve information turns on the unique factors in each case and, thus, cannot be considered in a vacuum. *Id.* Although reserve information generally has been held to be irrelevant in cases involving coverage issues, *Erie* recognized that a few courts had determined that such information is relevant in bad faith cases. *Id.* at 359–60 (citing *Lipton v. Superior Court,* 48 Cal. App.4th 1599, 56 Cal.Rptr.2d 341 (1996); *Tackett v. State Farm Fire & Cas.,* 558 A.2d 1098 (Del.Sup.Ct.1988); *Groben v. Travelers Indem. Co.,* 49 Misc.2d 14, 266 N.Y.S.2d 616, 619 (N.Y.Sup.Ct.1965)).

2.

Bituminous asserts that its reserves are neither a best nor worst case scenario, but rather a combination of these and other factors designed to help the company assign a safe value as a liability for a claim. It em-phasizes that a reserve is not a value it is willing to pay on a claim at that time, or even at some future time; nor is it the value the claimant deserves, or the value that a jury will likely return as a verdict. Consequently, it argues that its reserve information is irrelevant to whether it violated the UTPA.

To support its argument that reserve information has very little probative value, Bituminous relies on *Fidelity and Deposit Company of Maryland v. McCulloch,* 168 F.R.D. 516, 525 (E.D.Pa.1996), a case in which an insurance company instituted a declaratory judgment action to determine its rights and obligations under a Pension and Welfare Fund Fiduciary Responsibility Policy. *Id.* at 516–517. The insureds counterclaimed, alleging breach of contract, breach of fiduciary duty, and bad faith under the Pennsylvania Unfair Insurance Practices Act, and moved to compel the insurance company to produce its reserve information. *Id.* at 525.

The court in *McCulloch* noted that, in an effort to protect consumers by monitoring the financial condition of their insurers, Pennsylvania requires insurance companies to set aside reserves upon notice of potential losses under their polices. *Id.* It also indicated that it had consistently held that requests for production of reserve information are not "reasonably calculated" to lead to the discovery of admissible evidence. Given that numerous considerations factor into complying with the statutory direction to set reserves, the court concluded that only a tenuous link exists between reserves and actual liability. *Id.*

The court also dismissed the argument that compelling the production of reserve information would assist the defendants in establishing bad faith on the part of the insurance company. Although the defendants in *McCulloch* had asserted that the insurance company's attempts to disclaim coverage were motivated solely by a desire to avoid paying escalating defense costs, *id,* the court concluded that, at most, the reserve information sought would merely suggest what the insurance company was likely to concede, that the cost of defending the un-

derlying claims had increased over time. It, therefore, denied the motion to compel. *Id.*

### 3.

As noted earlier, in this case the Nicholases have alleged that Bituminous violated the UTPA by failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of their claims after the liability of its insureds had become reasonably clear, and also by failing to acknowledge coverage under Coverage C of the "Commercial Liability Coverage Form." They contend that reserve information is relevant to the central issue of whether Bituminous acted in bad faith in handling their claims. Thus, they seek a complete history of the individual loss reserves that Bituminous compiled with respect to their underlying tort claims and lawsuit, from the first notification of their claims to the present.

To support their contention that loss reserve information is relevant to their bad faith claim against Bituminious, the Nicholases rely on *North River Insurance Company v. Greater New York Mutual Insurance Company*, 872 F.Supp. 1411, 1412 (E.D.Pa.1995), a case that the defendants in *McCulloch* cited to support their position that loss reserves were relevant in that case.

The major issue in *North River* was whether the insurance company had acted in bad faith in not settling a personal injury action within policy limits before trial when the plaintiff had been willing to do so. The district court in that case concluded that the reserve information had a direct bearing on the issue of bad faith because (1) the reserve information related to the insurer's estimate of its insureds' potential liability, and (2) was relevant to the question of whether the insurance company had acted in bad faith during pretrial settlement negotiations. *Id.* at 1412.

To resolve the dispute here, the Court must first determine whether the evaluation of its insureds' liability that Bituminous undertook as part of the process of setting its loss reserve is relevant to the central issues in dispute. As in *North River*, the loss reserves compiled by Bituminous concerning the plaintiffs' individual claims would clearly be affected by the insurer's estimation of its insureds' potential liability, and by its belief about what coverage existed under its policies for such claims.

Bituminous' contentions that its loss reserves are based on various assumptions and "are nothing more than mere estimates of the safe value to reserve to insure that adequate funds would be available if the claim became sufficiently mature to settle or if an adverse verdict was returned" relate to the weight of the evidence and not its relevancy for purposes of discovery. Accordingly, based on the Nicholases' assertions of alleged violations of the UTPA, the Court concludes that Bituminous' reserve information is relevant to whether it acted in bad faith, and is discoverable *unless* it is protected by the work-product doctrine.

### B. Work Product Doctrine

■ Challenging the magistrate judge's conclusion that the reserve information they seek is protected by the opinion work-product doctrine, the Nicholases contend that Bituminous has failed to produce evidence suggesting that the creation of any reserve document was "in anticipation of litigation." They further assert that Bituminous' contention that its loss reserve information was created solely by line claims personnel and not defense counsel demonstrates that such loss reserve information was created in the ordinary course of insurance business and not "in anticipation of litigation." They contend, moreover, that every reserve document withheld by Bituminous was created subsequent to the filing of the underlying suit, which occurred on November 3, 2003, and, that the work-product rule, therefore, does not apply to those documents because they were not prepared "in anticipation of litigation."

### 1.

Case law applying Fed.R.Civ.P. 26(b)(3) defines the scope of the work-product doctrine in this diversity case. As codified in Rule 26(b)(3), the work-product doctrine does not protect documents from discovery *unless* they are prepared "in anticipation of litigation or for trial by or for another party or by

or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." Work product that includes the mental impressions, conclusions, opinions or legal theories of an attorney or other representative of a party concerning the litigation receives even greater protection. *In re Grand Jury Proceedings*, 33 F.3d 342, 348 (4th Cir.1994).

■ Importantly, the work-product doctrine is not confined solely to information and materials gathered or assembled by a lawyer, but also covers materials gathered by any consultant, surety, indemnitor, insurer, agent, or even the party itself. *Duplan Corp. v. Deering Milliken, Inc.*, 540 F.2d 1215 (4th Cir.1976); *see also Rhone–Poulenc Rorer Inc. v. Home Indemnity Co.*, 139 F.R.D. 609, 615 (E.D.Pa.1991). Thus, loss reserve information assembled by Bituminous' line claims handlers would be protected under the work-product doctrine.

### 2.

The key issue in this case, thus, is whether mental impressions, conclusions and opinions were documented by either a lawyer or non-lawyer "in anticipation of litigation." In his analysis of this issue, Magistrate Judge Kaull relied on the case of *Mordesovitch v. Westfield Ins. Co.*, 244 F.Supp.2d 636 (S.D.W.Va. 2003, Haden, J), which held that, to determine whether a document was prepared in "anticipation of litigation," the primary motivating purpose behind the creation of the document must have been to assist in pending or probable future litigation. *Id.* at 642. *Mordesovitch* stated that a court should consider the nature of the requested documents, the reason the documents were prepared, the relationship between the preparer of the document and the party seeking protection from discovery, the relationship between the litigating parties, and any other facts relevant to the issue. *Id.*

In *Mordesovitch* the insurer's reserve information was not protected by the attorney-client privilege simply because there had been no communications between the client and attorney. *See also USF & G v. Canady*, 194 W.Va. 431, 460 S.E.2d 677, 684–85 (1995)(holding that the communication between the attorney and client must be intended to be confidential for the attorney-client privilege to exist). However, because the reserve information had been prepared by the insurer "in anticipation of litigation" and revealed the mental impressions, thoughts and conclusions of the defendant in evaluating a legal claim, it was protected by the work-product doctrine. *Mordesovitch*, 244 F.Supp.2d at 644.

### 3.

Obviously, no hard and fast rule exists to determine when a document has been created in the ordinary course of business and is not protected by the work product doctrine, or when a document is prepared "in anticipation of litigation," and, is, therefore, protected. Consequently, a court must carefully analyze the factual circumstances under which the requested documents were created, consider the purpose of the representatives in preparing the requested documents, and examine the documents themselves.

From his review of the documents withheld by Bituminous in this case, Magistrate Judge Kaull concluded that the plaintiffs had retained an attorney shortly after the underlying motor vehicle accident who then had contacted Bituminous. Thus, Bituminous had been on notice early in the case that litigation was reasonably foreseeable; its loss reserve information, therefore, had been prepared "in anticipation of litigation." Magistrate Judge Kaull further determined that the loss reserves of Bituminous contained mental impressions, conclusions and opinions that were entitled to greater protection as opinion work-product.

Once Bituminous had notice of potential litigation, it viewed the Nicholases as plaintiffs, and evaluated not only the substance of their claims but also the potential financial consequences to the company resulting from a lawsuit. Therefore, Bituminous' primary motivating purpose for setting the loss reserves went beyond its ordinary course of investigating and handling claims and was a financial evaluation of the claim from the standpoint of pending or anticipated litigation. The fact that Bituminous continued to set reserves after the plaintiffs filed their

complaint does not change the quality of the reserve information that requires work-product protection. Fed.R.Civ.P. 26(b)(3) protects documents that are "prepared in anticipation of litigation *or for trial*" (emphasis added).

After being sued by the Nicholases, Bituminous adjusted its reserves as it obtained information concerning the venue of the lawsuit and in an attempt to reserve enough funds to cover the possibility of an adverse judgment. Therefore, Magistrate Judge Kaull's finding that the loss reserve information was protected by the work-product doctrine was protective of the policy behind the work-product privilege and was neither clearly erroneous nor contrary to law.

### C. Waiver of Work–Product Privilege

■ Magistrate Judge Kaull further concluded that, by asserting the "advice of counsel" defense, Bituminous had waived the work-product privilege as to any attorney work-product material communicated to Bituminous. He specifically found that any loss reserve information otherwise protected by the opinion work-product doctrine, but communicated to Bituminous, was not to be protected by the work-product privilege.

#### 1.

■ Invoking reliance on the advice of counsel defense constitutes a waiver of the work-product doctrine. *Rhone–Poulenc Rorer, Inc. v. Home Indemnity Co.*, 32 F.3d 851, 862–64 (3rd Cir.1994); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156 (9th Cir.1992). Importantly, however, asserting the advice of counsel defense does not waive information protected by the work-product doctrine unless counsel communicated the information to the defendant. *Nitinol Medical Technologies, Inc. v. AGA Medical Corp.*, 135 F.Supp.2d 212, 218 (D.Mass.2000); *Cordis Corp. v. SciMed Life Sys., Inc.*, 980 F.Supp. 1030 (D.Minn.1997); *Thorn EMI N. Am., Inc., v. Micron Tech., Inc.*, 837 F.Supp. 616, 620 (D.Del.1993). Accordingly, Magistrate Judge Kaull's ruling that, by asserting the "advice of counsel" defense, Bituminous waived any work-product privilege for the loss reserve information it received from

counsel is not clearly erroneous or contrary to law unless his analysis overlooked the fact that Bituminous' reserve documents had not been communicated to it by any counsel.

#### 2.

Bituminous claims that its reserve information was created by line claims handlers with no contribution from either outside or in-house counsel. It argues that specific loss reserve estimates were prepared and updated by line claim handlers and managers without the advice of counsel and, thus, are protected despite Bituminous' assertion of the "advice of counsel" defense.

According to the Nicholases, five in-house attorneys at Bituminous were involved with the processing of their claims, and the privilege log clearly indicates that at least one of them was involved in setting reserves for their claims. Specifically, they reference six entries in Bituminous' privilege log describing memoranda sent by Mike Moroney to Bruce M. Horack regarding reserve amounts and argue that Horack is an in-house attorney who was involved in the processing of their claims. They conclude from that information that legal counsel repeatedly communicated with Bituminous' claims personnel regarding reserve amounts.

Bituminous responds that the specific memoranda referenced in those entries were created by non-attorney line claims personnel, and that Bruce Horack not only was not the originator of the documents but acted solely in his capacity as Vice President of Claims for Bituminous when receiving those documents.

Whether any of the reserve documents listed by Bituminous on its privilege log and produced for *in camera* review had actually been communicated to Bituminous by its counsel is determinative of the outcome here. After conducting an *in camera* review of these reserve documents, the Court finds that they were created by non-lawyer line claims handlers and do not indicate any contribution by Bituminous' outside or in-house counsel. The reserve documents make clear that Mr. Horack received the memoranda in his role as Vice President of Claims, and that

he did not undertake to set reserves or offer any legal advice about that process. The reserve documents, thus, contain only the mental impressions, conclusions, and opinions reached by line claims handlers in setting the loss reserve amounts for the Nicholases' claims.

Because those documents do not contain any opinions from legal counsel concerning "the investigation and defense of the insureds' interests in the underlying tort claim," Bituminous has not waived the work-product privilege protecting those documents by asserting the "advice of counsel" defense. Therefore, all documents concerning loss reserves as denoted on Bituminous' privilege log are protected by the work-product doctrine and are not discoverable in this litigation.

## IV. CONCLUSION

For the reasons stated above, the Court SUSTAINS Bituminous' objection to Magistrate Judge Kaull's Order/Opinion (Docket No. 308).

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to counsel of record.