**CHEVRON CORPORATION,**
Plaintiff–Appellant,

v.

**PENNZOIL COMPANY,**
Defendant–Appellee.

No. 90–16833.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 14, 1992.

Decided Sept. 9, 1992.

William I. Edlund, C. Douglas Floyd, and Walter J. Robinson, Pillsbury, Madison & Sutro, San Francisco, Cal., for plaintiff-appellant.

Stephen V. Bomse, Jonathan P. Hayden, David C. Brownstein, and Mary Ann Yarbrough, Heller, Ehrman, White & McAuliffe, San Francisco, Cal., for defendant-appellee.

Before: SCHROEDER, REINHARDT, and KLEINFELD, Circuit Judges.

SCHROEDER, Circuit Judge:

I. *Introduction*

The Chevron Corporation appeals from the district court's order granting summary judgment in favor of the Pennzoil Company in Chevron's action seeking injunctive relief to halt Pennzoil's purchase of Chevron stock. Chevron's complaint alleged that Pennzoil's Schedule 13D, filed pursuant to Section 13(d) of the Williams Act, 15 U.S.C. § 78m(d), was materially misleading. Chevron also appeals the district court's partial denial of Chevron's motion to compel discovery of Pennzoil's communications with its tax counsel. Chevron contends that there exist genuine issues of material fact concerning Pennzoil's true purposes in acquiring Chevron stock, and that Pennzoil waived the attorney-client privilege with respect to the communications Chevron sought. We reverse on both issues.

This case arises out of the three billion dollar settlement of Pennzoil's earlier suit against Texaco over Pennzoil's claim that Texaco wrongfully interfered with Pennzoil's contractual agreement to invest in the Getty Oil Company. Pennzoil began reinvesting the proceeds of that settlement in Chevron stock. One of Pennzoil's stated purposes was to defer taxes owed on the settlement proceeds by making a similar reinvestment pursuant to section 1033 of the Internal Revenue Code. 26 U.S.C. § 1033. Chevron filed this suit to enjoin the investment, challenging the adequacy of Pennzoil's statement required under the Williams Act, 15 U.S.C. § 78m(d)–(e). In a nutshell, Chevron claims that Pennzoil's disclaimer in that statement of any intent to exert control over Chevron by election of board members or otherwise was not made in good faith because Pennzoil did intend to attain a control position.

The district court granted summary judgment for Pennzoil on the ground that the affidavits of Pennzoil's directors established that at the time of the Williams Act filing, Pennzoil did not intend to exert control over Chevron management, and that Pennzoil relied in good faith on its counsel's belief that management control was not absolutely necessary to obtain the tax deferral allowed under section 1033. 26 U.S.C. § 1033. The district court ruled that the evidence submitted by Chevron concerning discussions by Pennzoil officials of the possibility of exercising control over Chevron, and Chevron's proffer of expert testimony that Pennzoil could not adequately protect its tax position without regaining the same control position in Chevron that it had sought in Getty, were insufficient to create a genuine issue of material fact as to the good faith of Pennzoil's disclosure.

On appeal, Chevron contends that the district court erroneously granted summary judgment because there are triable issues of fact concerning whether Pennzoil's true but undisclosed purpose was to obtain representation on the board and exercise influence over Chevron management, thereby making Pennzoil's Schedule 13D materially misleading. In addition, Chevron challenges the district court's ruling upholding Pennzoil's claim of attorney-client privilege with respect to communications on which Pennzoil rested its claim that its Schedule 13D was in accordance with attorney advice.

II. *Background*

The Williams Act, 15 U.S.C. §§ 78*l*–n, was adopted in 1968 to extend the advance disclosure requirements of the federal securities laws to investors using cash tender offers to effect corporate takeovers. *See* S.Rep. No. 550, 90th Cong., 1st Sess. 2–4 (1967); H.R.Rep. No. 1711, 90th Cong., 2d Sess. 2–4 (1968); U.S.Code Cong. & Admin.News 1968, 2811–2814; *see also Piper*

*v. Chris–Craft Industries, Inc.,* 430 U.S. 1, 22, 97 S.Ct. 926, 939–40, 51 L.Ed.2d 124 (1977). The Act amended Section 13 of the Securities and Exchange Act of 1934 to provide for such disclosures. The purpose of the Act is to insure that, through adequate disclosure, public shareholders confronted by a tender offer or the purchase of a large block of shares by a third party, will be informed about the intentions and qualifications of the third party. *See Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 58, 95 S.Ct. 2069, 2075–76, 45 L.Ed.2d 12 (1975); *Indiana Nat'l Corp. v. Rich,* 712 F.2d 1180, 1183 (9th Cir.1983); S.Rep. No. 550, 90th Cong., 1st Sess. 2 (1967). Thus, the Act is designed to get essential information to investors enabling them to make informed investment decisions. *Piper,* 430 U.S. at 31, 97 S.Ct. at 944. The Act is not intended "to provide a weapon for management to discourage takeover bids or prevent large accumulations of stock which would create the potential for such attempts." *Rondeau,* 422 U.S. at 58, 95 S.Ct. at 2076.

◼ This court has held that an issuer corporation has a private right of action for injunctive relief under Section 13(d) of the Act. *See Indiana Nat'l Corp.,* 712 F.2d at 1184. Because the sole purpose of Section 13(d) is to protect shareholders, however, the issuer corporation is deemed to act on the shareholders' behalf in seeking injunctive relief until an accurate Schedule 13D is filed. *Id.* at 1185.

The Williams Act requires that within ten days after acquiring more than five percent of the outstanding shares of an issuer's stock, the purchaser of such stock must file a Schedule 13D with the issuer, the exchange where the stock is traded, and the Securities and Exchange Commission. 15 U.S.C. § 78m(d)(1). Section 13(d)(1) requires that the Schedule 13D contain, among other things: (1) the "background, and identity" of the purchaser; (2) "the source and amount of the funds or other consideration used or to be used in making the purchases;" (3) "if the purpose of the purchases or prospective purchases is to acquire control of the business of the issuer of the securities, any plans or proposals which [the purchaser] may have to liquidate such issuer, to sell its assets to or merge it with any other persons, or to make any other major change in its business or corporate structure;" and (4) the extent of the purchaser's holdings in the issuer company. 15 U.S.C. § 78m(d)(1). Once a purchaser of securities becomes the beneficial owner of more than five percent of any equity security interest in a single corporation, that purchaser has ten days within which to file a Schedule 13D. The regulations implementing the statute expressly require the statement of purpose to include any plans for any change in the Board of Directors.[1]

In April 1988, Pennzoil received three billion dollars in settlement proceeds from Texaco. In October 1989, Pennzoil began purchasing Chevron's outstanding common stock using the proceeds from the Texaco settlement. By November 27, 1989, Pennzoil had acquired 5% of Chevron stock, and

---

1. Item 4 of Schedule 13D as set forth in the regulations provides in pertinent part:

   *Purpose of Transaction.* State the purpose or purposes of the acquisition of securities of the issuer. Describe any plans or proposals which the reporting persons may have which relate to or would result in:

   (a) The acquisition by any person of additional securities of the issuer, or the disposition of securities of the issuer;

   (b) An extraordinary corporate transaction, such as a merger, reorganization or liquidation, involving the issuer or any of its subsidiaries;

   (c) A sale or transfer of a material amount or assets of the issuer or any of its subsidiaries;

   (d) Any change in the present board of directors or management of the issuer, including any plans or proposals to change the number or term or directors or to fill any existing vacancies on the board;

   (e) Any material change in the present capitalization or dividend policy of the issuer;

   (f) Any other material change in the issuer's business or corporate structure ...;

   . . . . .

   (j) Any action similar to any of those enumerated above.

   17 C.F.R. § 240.13d–101.

ten days later Pennzoil filed a Schedule 13D with the Securities and Exchange Commission pursuant to the Williams Act. For purposes of this appeal, the relevant portion of the Schedule 13D filing is Item 4, which addresses Pennzoil's purpose in purchasing Chevron stock, and provides in its entirety:

*Item 4  Purpose of Transaction.*

The Shares owned by Pennzoil have been acquired as a long-term investment. See the accompanying letter to Pennzoil shareholders filed as Exhibit 1 hereto. In addition to the expected benefits from ownership of the Shares, including potential appreciation in the value of the Shares and the potential receipt of dividends and distributions payable or made on the Shares. Pennzoil believes that its investment in the Shares may provide Pennzoil the opportunity to defer for an indefinite period a portion of the federal income taxes that would otherwise be payable currently on the litigation settlement proceeds which Pennzoil received from Texaco in 1988.

Pennzoil may decide to continue to expend up to an amount equal to the original Texaco settlement net proceeds (approximately $2.6 billion) to purchase additional shares for investment from time to time. Such additional purchases, if any, will be dependent upon, among other factors, prevailing market prices for the Shares and prevailing market and economic conditions generally.

Pennzoil will monitor on a regular basis its investment in the Shares and the Issuer's business affairs and financial position, as well as the market value of the Shares, conditions in the securities markets and general economic and industry conditions. Depending on the results of Pennzoil's ongoing review, Pennzoil may in the future take such actions in respect of its investment in the Shares it deems appropriate in light of circumstances existing from time to time.

Although Pennzoil has for analytical purposes considered the hypothetical effect of higher percentage levels of investment up to as much as 18% and the effect of accounting for such an investment using the cost method and the equity method of accounting, Pennzoil has no current plans or proposals other than those set forth above in the second paragraph of this Item 4 which relate to or would result in (i) the acquisition by any person of additional securities of the Issuer, or the disposition of securities of the Issuer, (ii) an extraordinary corporate transaction such as a merger, reorganization or liquidation, involving the Issuer or any of its subsidiaries, (iii) a sale or transfer of a material amount of assets of the Issuer or any of its subsidiaries, (iv) any change in the present board or directors or management of the Issuer, (v) any material change in the present capitalization or dividend policy of the Issuer, (vi) any other material change in the Issuer's business or corporate structure, (vii) changes in the Issuer's charter, bylaws or instruments corresponding there to or other actions which may impede the acquisition of control of the Issuer by any person, (viii) causing a class of securities of the Issuer to be delisted from a national securities exchange, (ix) a class of equity securities of the Issuer becoming eligible for termination of registration pursuant to Section 12(g)(4) of the Exchange Act or (x) any action similar to those enumerated above.

In paragraph four of this statement Pennzoil asserts that it "has no current plans or proposals ... which would relate to or result in ... (iv) any change in the present board or management of the Issuer." As of December 7, 1989, Pennzoil had acquired 31,524,500 shares of Chevron stock, or about 8.8% of Chevron's outstanding stock, at a cost of approximately $2.1 billion.

On December 7, 1989, Chevron filed a complaint in the district court alleging that Pennzoil violated: (1) Section 13(d) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78m(d), and the rules and regulations promulgated thereunder; and (2) the Hart–Scott–Rodino Antitrust Improvements Act of 1976, 15 U.S.C. § 18a, and the premerger notification rules promulgated thereunder. The complaint sought: (1) to require Pennzoil to make corrective disclo-

sures as to its purpose in purchasing Chevron stock; (2) to preliminarily and permanently enjoin Pennzoil from violating Section 13(d) and from purchasing any additional shares of Chevron stock until Pennzoil made a corrective disclosure and complied with the Hart–Scott–Rodino Act; (3) to require Pennzoil to divest itself of all Chevron stock; (4) a declaration that Pennzoil violated Section 13(d) and the Hart–Scott–Rodino Act, and that Chevron's board of directors did not violate its fiduciary duties.

### III. *Summary Judgment Ruling*

Pennzoil moved for summary judgment, contending that Chevron had failed to demonstrate the existence of triable questions of fact regarding Pennzoil's compliance with the Schedule 13D disclosure requirements. Pennzoil relied on affidavits and declarations from witnesses that described Pennzoil's tax position as reasonable, though not optimal. Pennzoil asserted that the Chevron investment was made for a combination of investment and tax reasons, all of which were accurately and adequately disclosed in the Schedule 13D.

According to Pennzoil, the disclosures included in the Schedule 13D were the result of thorough deliberations on the investment and tax consequences of the Chevron investment. Nearly two years after beginning its search for an appropriate investment, the Pennzoil board examined a number of "case-studies" which analyzed the financial repercussions of differing levels of investment in Chevron. The studies revealed that if Pennzoil purchased 18% of Chevron's stock, thereby maximizing its potential for receiving the tax deferral by making its investment position virtually identical to what it would have been in Getty, its earnings would diminish and its cash flow would be adversely affected. Investment of the proceeds in a smaller company was rejected by Pennzoil because Chevron presented a more promising investment with appreciation potential.

In further support of its assertion that its Schedule 13D was complete and accurate, Pennzoil submitted the declaration of Donald Alexander, an experienced tax practitioner and former Internal Revenue Commissioner. After analyzing Pennzoil's investment position, Alexander concluded that Pennzoil has "reasonable grounds for its expectation that an investment of 8.8% to 9.9% in Chevron may qualify as replacement property under IRC § 1033."

Chevron responded to Pennzoil's assertions by arguing that the fundamental objective of Pennzoil's investment was to defer federal tax obligations, and that triable issues of fact existed concerning Pennzoil's need to obtain a seat on the Chevron Board and Pennzoil's ability to exert management influence at Chevron. Chevron relied in large part on its tax expert, Professor Boris Bittker, who explained that Pennzoil could obtain a tax deferral on the Texaco settlement proceeds only if it acquired replacement property that was similar to the Getty investment. According to Professor Bittker, to be sufficiently similar, the investment needed to give Pennzoil the same Board representation and management influence Pennzoil would have had with the Getty Oil Company. He concluded that "Pennzoil's asserted role in Chevron—a passive, 8.8% interest with no representation on the board of directors—is not essentially the same as or similar to the active and influential position that it would have had in Getty." In his opinion, the tax deferral could not be obtained without at least some plan or purpose on Pennzoil's part to obtain board representation.

Chevron also relied upon deposition testimony from Pennzoil executives acknowledging that Pennzoil's tax position would be improved if board representation were secured. The importance of board representation was discussed at Pennzoil Board meetings, and Senior Executives employed by Pennzoil testified that such representation was the hope of J. Hugh Liedtke, Pennzoil's Board Chairman and its former Chief Executive Officer.

Chevron argues that, in addition to Professor Bittker's expert opinion, and the admitted intentions of the Pennzoil executives to obtain the tax advantage, the sheer enormity of Pennzoil's tax obligation on the

Texaco settlement proceeds, over $800 million, compels the conclusion that Pennzoil could not reasonably have intended anything other than obtaining a control position. Because Chevron's evidence supports the conclusion that a tax deferral would require Board representation and some level of management influence, Chevron argues that there is at least a triable issue of fact as to whether Pennzoil's failure to include any such aspirations in the Schedule 13D was misleading and not credible.

In granting summary judgment, a district court is not entitled to weigh the evidence and resolve disputed underlying factual issues. *See Morales v. Merit System Protection Board,* 932 F.2d 800, 803 (9th Cir.1991). Rather, the district court was obliged to view all inferences to be drawn from "the underlying facts ... in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

█ The district court in this case ruled that Chevron raised no genuine issue of material fact as to whether Pennzoil complied with the disclosure requirements of Section 13(d). In reaching this conclusion, the court accepted at face value Pennzoil's declarations that it had made a decision not to seek any control, in spite of its tax position, and that such a decision was reasonable. In so doing, the district court either ignored or impermissibly weighed and rejected the declarations submitted by Chevron that such a decision was not reasonable.

The district court's analysis did not consider the practical economic realities of Pennzoil's position in light of Chevron's affidavits supporting its position that Pennzoil's tax interests were better served by attaining, rather than disdaining, a control position. The Supreme Court has stated that where "the factual context renders [a] claim implausible—if the claim is one that simply makes no economic sense—[the claimants] must come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). While in this case we need not go so far as to find Pennzoil's Section 13(d) claim—that its purchase of Chevron stock was simply a good investment that might provide some tax benefit—economically implausible—it is significant that Chevron's analysis makes better economic sense in light of the enormous tax liability Pennzoil will face if the deferral is denied. Pennzoil admits that it has now invested $2.2 billion of the settlement proceeds in approximately 9.4% of Chevron's outstanding stock. Pennzoil will be forced to pay in excess of $800 million in federal taxes if it cannot demonstrate, to the Internal Revenue Service's satisfaction, that the Chevron investment is sufficiently similar to the Getty investment. On the basis of the record in this case, Pennzoil's argument that, in purchasing Chevron stock it merely sought a solid long term investment and did not intend to make every effort to obtain the tax deferral, is subject to serious doubt. Under these circumstances, Chevron's affidavits were sufficient to raise a genuine issue of material fact. A reasonable trier of fact, drawing the inferences most favorable to Chevron, could conclude from the affidavits and other cognizable evidence before the court that Pennzoil more probably than not sought control. The basis for the inference would be that without control, Pennzoil would know that it would be likely to lose an $800,000,000 tax deferral. Chevron did not need an admission or other direct evidence of Pennzoil's intentions to establish a genuine issue of fact, where the inference from economic reasonableness was so clear.

We conclude that the district court erred in granting Pennzoil summary judgment. Based on the evidence submitted by Chevron, a reasonable inference could be drawn that Pennzoil's Schedule 13(d) statement was materially misleading because it failed to adequately disclose Pennzoil's intent to obtain a board position and exert some level of management influence over Chevron's operations.

## IV. *Attorney–Client Privilege*

During the course of discovery, a subsidiary issue developed concerning the basis for Pennzoil's position that it was reasonable to acquire the stock for investment purposes only. Pennzoil maintained that this position was taken pursuant to the advice of its lawyers. The advice was received at the November 1, 1989, meeting of the Pennzoil Board. At that meeting Pennzoil Senior Executives and members of the Pennzoil Board reviewed a number of proposals for acquisition of Chevron stock. Chairman Liedtke's declaration, submitted as evidence by Pennzoil, refers to this meeting and asserts that "[i]nsofar as the decision to proceed with an investment in Chevron was based upon tax considerations, it was made in reliance upon the advice of our tax counsel."

Chevron sought to compel disclosure of written materials that supported Pennzoil's belief that its tax position was reasonable and sound. Pennzoil refused to supply these documents, claiming that its position was based upon advice from counsel and thus was protected by the attorney-client privilege. Fed.R.Evid. 501. In response, Chevron argued that Pennzoil had waived the attorney-client privilege by disclosing to an outside auditor documents which discussed questions relevant to the tax deferral. Alternatively, Chevron argued that the privilege was waived when Pennzoil affirmatively placed at issue the very information for which it was claiming the privilege.

■ Pennzoil concedes that the district court was correct in ordering disclosure of the documents actually provided to the outside auditor. *See Weil v. Investment/Indicators, Research & Management*, 647 F.2d 18, 24 (9th Cir.1981) (voluntary disclosure of a privileged attorney communication to a third party constitutes waiver of privilege); 8 J. Wigmore, *Evidence* § 2291 at 554 (McNaughton rev. 1961). Pennzoil disagrees, however, with Chevron's assertion that Pennzoil waived its claim of privilege with respect to all documents touching on the tax deferral question by disclosing to an outside auditor two legal memoranda involving subsidiary tax issues. The district court correctly ruled that Pennzoil's

waiver with respect to information disclosed to the auditor did not constitute waiver as to all communications concerning the hoped for tax deferral. As this court has held, the disclosure of information resulting in the waiver of the attorney-client privilege constitutes waiver "only as to communications about the matter actually disclosed." *Weil*, 647 F.2d at 25. Pennzoil was not required, as a result of the limited disclosure, to provide Chevron with every document or communication that touched on the more general tax deferral question. *See In re Von Bulow*, 828 F.2d 94, 102–103 (2d Cir.1987) (disclosure of privileged communications did not waive privilege beyond "matters actually revealed").

■ Alternatively, Chevron argues that Pennzoil waived the privilege by using advice of counsel both as a sword to defeat Chevron's tax arguments, and as a shield to protect against the disclosure of the basis for Pennzoil's affirmative defense. This argument has merit. Pennzoil has asserted that its Schedule 13D is not materially misleading because its tax position is "reasonable" according to advice given by tax counsel. Although this legal advice is the basis for the Schedule 13D's asserted validity, Pennzoil contends that the communications are privileged and thus not subject to disclosure.

■ The privilege which protects attorney-client communications may not be used both as a sword and a shield. *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir.1991). Where a party raises a claim which in fairness requires disclosure of the protected communication, the privilege may be implicitly waived. *Id.* In *Bilzerian* the defendant's intent was in issue because he thought his actions were legal, and had discussed the allegedly fraudulent transactions with his attorney. According to the Second Circuit this "would have put his knowledge of the law and the basis for his understanding of what the law required in issue. His conversations with counsel regarding the legality of his schemes would have been directly relevant in determining the extent of his knowledge and, as a result, his intent." *Id.* at 1292. Similarly, to the extent that Pennzoil claims that its tax position is reasonable because it was based

on advice of counsel, Pennzoil puts at issue the tax advice it received. In his declaration, Chairman Liedtke stated that insofar as Pennzoil's decision to proceed with the Chevron investment was based on tax considerations, that decision was made based upon the advice of counsel. Pennzoil cannot invoke the attorney-client privilege to deny Chevron access to the very information that Chevron must refute in order to demonstrate that Pennzoil's Schedule 13D is materially misleading.

## V. *Conclusion*

Chevron presented sufficient evidence to create a genuine issue of material fact as to Pennzoil's intention when Chevron offered declarations supporting its claim that Pennzoil's Schedule 13D made little economic sense. Insofar as Pennzoil relied upon the advice of counsel to support the reasonableness of its Schedule 13D, Pennzoil waived the attorney-client privilege with respect to those communications.

The judgment of the district court is REVERSED and the matter remanded for further proceedings.