Thomas LA PARNE et al., Plaintiffs,

v.

**MONEX DEPOSIT COMPANY et al., Defendants.**

Case No. SACV 08–0302 DOC.

United States District Court, C.D. California.

April 29, 2010.

Alexander G. Van Broek, Alexander G. Van Broek Law Office, John M. Kelson, John M. Kelson Law Office, Oakland, CA, Justin T. Berger, Laura Schlichtmann, Niall P. McCarthy, Cotchett Pitre & McCarthy, Burlingame, CA, for Plaintiffs.

Douglas E. Dexter, Neil A. Goteiner, Farella Braun and Martel, LLP, San Francisco, CA, Thomas A. Pistone, Pistone and Wolder, Irvine, CA, for Defendants.

## *ORDER* GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

DAVID O. CARTER, District Judge.

Before the Court is Defendants Monex Deposit Company, Comco Management Corporation, Monex Credit Card Company, and Metco Management Corporation's Motion for Summary Adjudication (the "Motion"). After considering the moving, opposing, replying, surreplying papers,[1] supplemental briefing, and evidentiary objections, as well as oral argument by counsel, the Court hereby GRANTS Defendants' Motion.

## I. BACKGROUND

### A. Procedural Background

Plaintiffs Thomas La Parne and Emile Bouari ("Plaintiffs") have brought this class action on behalf of themselves and others similarly situated. Plaintiffs were allegedly employed by Defendant Monex Deposit Company, a California limited partnership. Defendant Monex Credit Company ("Monex") is also a California limited partnership whose general partner is Defendant Metco Management Corporation, a California corporation. Defendant Comco Management Corporation is a California corporation whose general partner is Defendant Monex Deposit Company (collectively referred to as "Defendants"). Plaintiffs were employed as "Account Representatives" by Defendants to sell gold and other precious metals on Defendants' behalf. Plaintiffs and other Account Representatives were paid on an "index" or commission basis by Defendants.

Plaintiffs allege that Defendants supervise Account Representatives according to firm-wide policies and uniform practices. Plaintiffs allege that they regularly worked in excess of eight hours per day and forty hours per week without overtime compensation from Defendants. As a result, Plaintiffs filed a class action suit against Defendants on March 18, 2008 on behalf of themselves and "persons similarly situated." Although Account Representatives vary in experience, client base, and day-to-day activities, Plaintiffs allege that Account Representatives are encouraged by Defendants to work long hours in order to sell successfully. Plaintiffs allege that although Defendants encouraged them to work long hours, they were not compensated by Defendants for their overtime work. Plaintiffs also allege that portions of commissions were wrongfully withheld from Account Representatives. Plaintiffs further allege that Defendants failed to pro-

---

1. The Court notes and agrees with Defendants' argument that Plaintiff's sur-reply was not necessary and the arguments and evidence presented within it were available to Plaintiff at the time of the opposition brief. However, because the sur-reply is not dispositive of the issue, the Court will entertain it for the purpose of argument.

vide meal breaks and rest breaks to Plaintiffs in violation of California law. Finally, Plaintiffs allege that Defendants required Account Representatives to pay for an approved model of telephone headset and other expenses and either refused to reimburse the expenditure for the headset or issued a headset and deducted the cost from the employee's pay.

On March 9, 2009, the Court granted conditional Fair Labor Standards Act ("FLSA") certification of the class definition stated in the First Amended Complaint, holding that Plaintiffs had satisfied the lenient standard for conditional certification of a modest factual showing that plaintiffs were victims of a common policy or plan that violated the law.[2] Order Granting Pl.'s Mot. for Conditional FLSA Class Certification, at 4. Twenty-five Account Representatives opted into the class, although Monex disputes whether five opt-ins were timely. On December 22, 2009, the Court issued an order certifying class certification under Rule 23 as to Plaintiffs' overtime claims, headset reimbursement claims, and dependent UCL claims. Order Denying in Part and Granting in Part Pl.'s Mot. For Class Certification, at 15. The Court denied certification as to Plaintiffs' meal break claims, waiting time penalties claims, and pay stub claims. *Id.* at 14. The certified class is defined as: "All individuals who worked for Monex Deposit Company at any time on or after March 18, 2004, as an Account Representative or Account Representative trainee selling precious metals and coins to customers over the telephone from Monex' headquarters in Newport Beach, California." *Id.* at 15.

Defendants now move for summary judgment on the FLSA claims for the opt-in FLSA class as to whether Monex is a "retail or service establishment" within the meaning of the "retail sales exemption" to the Fair Labor Standards Act under Section 7(i).

## B. Factual Background

Monex sells precious metals. Customers learn about Monex primarily through television advertisements that are run daily on multiple national television stations, as well as through newspapers, Monex's website, sales brochures, and customer referrals. Undisputed Facts from Pl.'s Statement of Genuine Issues ("U.F.") at ¶ 2. Monex employs Account Representatives who function as salespeople, interacting with customers primarily by phone. *Id.* ¶ 6. Monex registers with the State of California, listing its Account Representatives as telemarketers. *Id.* ¶ 7. Some Account Representatives are licensed as brokers, and some are not, but Monex does not require them to be licensed. *Id.* ¶ 9. Account Representatives may give advice to customers regarding the purchase or sale of gold and other commodities within the customers' investment portfolios but do not otherwise give advice regarding customers' overall investment portfolios. *Id.* 10.

Monex does not offer managed accounts (also known as discretionary accounts). *Id.* 11. In other words, Monex does not offer customers the option of having their precious metal holdings looked after by a Monex employee with the discretionary power to decide when to buy or sell those holdings. Monex customers must explicitly consent to each transaction. *Id.* ¶ 12. Monex's procedure for the metals purchased are to transfer the metals either

---

**2.** In the Order, the Court set forth that conditional certification was the first tier of a two tier process. In the second tier of FLSA certification, defendants can move to decertify the class at the conclusion of discovery. Order at 4. Defendants have not done so.

directly to the customer or to a third party depository. *Id.* ¶ 3.

Account Representatives are not compensated on an hourly basis but by a system calculated on index points that are translated into commission dollars and combined with other incentives. *Id.* ¶ 14. This is initially supplemented by an introductory compensation guarantee for new employees. *Id.* Account Representatives' compensation varies from month to month. *Id.* ¶ 15. The precious metal market is subject to material price fluctuations and other developments, which, with the average purchase price of precious metals, can increase or decrease customer demand. *Id.* ¶ 17.[3]

## II. LEGAL STANDARD

Summary judgment is proper if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

The Court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Chevron Corp. v. Pennzoil Co.,* 974 F.2d 1156, 1161 (9th Cir.1992). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial, but it need not disprove the other party's case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out that the

non-moving party has failed to present any genuine issue of material fact. *Musick v. Burke,* 913 F.2d 1390, 1394 (9th Cir.1990).

Once the moving party meets its burden, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party." Fed.R.Civ.P. 56(e)(2); *see also Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505. Furthermore, a party cannot create a genuine issue of material fact simply by making assertions in its legal papers. There must be specific, admissible evidence identifying the basis for the dispute. *S.A. Empresa De Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.,* 690 F.2d 1235, 1238 (9th Cir.1982). The Supreme Court has held that "[t]he mere existence of a scintilla of evidence ... will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

## III. DISCUSSION

 Under the Fair Labor Standards Act, employers must comply with, *inter alia,* overtime pay requirements of one and a half times the employee's regular rate. 29 U.S.C. § 201 *et seq.* There are various exemptions to these requirements. An employer claiming an exemption from the FLSA bears the burden of showing that the exemption applies. *Gieg v. Howarth,* 244 F.3d 775, 776 (9th Cir.2001). Exemptions from the FLSA for retail or service establishments "are to be narrowly construed against the employers seeking to assert them, and their application limit-

---

**3.** The Court notes that both parties have submitted evidentiary objections. These are addressed only were the Court relies on that evidence in reaching its judgment.

ed to those plainly and unmistakably within their terms and spirit." *Bennett v. SLT/TAG Inc.*, No. Civ. CV 02–65–HU, 2003 WL 23531402, at *2 (D.Or. May 8, 2003) (citing *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960)); (*Mitchell v. Kentucky Finance Company*, 359 U.S. 290, 295, 79 S.Ct. 756, 3 L.Ed.2d 815 (1959)).

Section 7(i) of the FLSA, hereafter referred to as the retail sales exemption, provides that employers are exempted from overtime provisions for commission-compensated employees if: (1) the employee works for a "retail or service establishment"; (2) the employee's regular rate of pay exceeds one and one-half times the minimum applicable hourly rate; and (3) more than half the employee's compensation for a representative period represents commissions on goods or services. 29 U.S.C. § 207(I); P.L. 87–30, 75 Stat. 65, § 6(g).

In this Motion for Summary Judgment, Defendants only seek a determination regarding whether Monex falls within this first element of the exemption, whether Monex is a "retail or service establishment." Section 7(i) does not define "retail or service establishment." The term is to be interpreted as defined in the now repealed Section 13(a) of the FLSA. 29 C.F.R. § 779.312; *Gieg v. DDR, Inc.*, 407 F.3d 1038 (9th Cir.2005); *see Martin v. Refrigeration School, Inc.*, 968 F.2d 3, 5 (9th Cir.1992). The definition set forth in Section 13(a) is: "an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry." 29 C.F.R. § 779.312 (2008); 29 U.S.C. § 213(a) (repealed); *In re Wells Fargo Home Mortg. Overtime Pay Litigation*, 2008 WL 2441930, at *3–*4 (N.D.Cal. June 13, 2008).

The Department of Labor has also issued extensive regulations regarding the definition of "retail establishment." "The meaning of the term 'retail establishment' as used in the FLSA is the sort of question which implicates an agency's specialized knowledge so that we may assume Congress has implicitly delegated authority for answering the question to the party authorized to administer the statute," so the Court will defer to the agency's answer as long as it "represents a reasonable construction of the statute." *Martin*, 968 F.2d at 6 (citing *Chevron USA, Inc. v. NRDC*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).

Defendants argue that the application of the section, as well as the understanding of the term "retail establishment", should really focus on the nature of the compensation of the employee instead of the nature of the good. They base this theory on the Ninth Circuit's recognition that the policy justification under Section 7(i) "appears to have more to do with the employee's compensation than with the exact nature of the goods or services sold." *Gieg v. DDR, Inc.*, 407 F.3d 1038, 1046 (9th Cir.2005); *see also Mechmet v. Four Seasons Hotels, Ltd.*, 825 F.2d 1173 (9th Cir.1987). However, at the same time, Congress chose to include the requirement that the employer be a "retail or service establishment" in Section 7(i), so the Court cannot conclude that the requirement holds no meaning. By the very language of the exception, and despite any broader policy justifications that focused on commission compensation, Congress clearly intended that the exception should not apply to *all* employers but only to employers of retail and service establishments. Furthermore, courts have explicitly held that Congress' failure to provide a definition for "retail or service establishment" under Section 7(i) should apply the definition set forth in Section

213(a)(2), so the Court applies that analysis.[4]

## A. Sales of Goods or Services Not for Resale

The first and second elements of the "retail establishment" definition requires that there be a sale of goods and that they not be for resale. A "sale" under the FLSA includes "any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." 29 U.S.C. § 203(k). "Goods" include "commodities, merchandise, or articles or subjects of commerce of any character." 29 U.S.C. § 203(i). Plaintiffs do not dispute that the sale of precious metals by Monex constitutes a sale of goods.

While resale is not defined in the FLSA, the Department of Labor regulations state that the common meaning of the term "resale" is the "act of selling again" and that a sale is not made for resale under the FLSA "[i]f at the time the sale is made, the seller has no knowledge or reasonable cause to believe that the goods or services are purchased for the purpose of resale." 29 C.F.R. § 779.331.[5] The classic example of a good for resale is the sale of a raw material that will be incorporated into another good that will later be resold. For example, the sale of lumber to a furniture factory, which will later sell the furniture. 29 C.F.R. § 779.332; *Gieg*, 407 F.3d at 1049 n. 13. Plaintiffs contend that, although the metals sold by Monex will not be incorporated into another good, the very nature of the Monex business indicates that Monex has reasonable cause to believe that the goods are purchased for the purpose of resale.

■ Monex acknowledges that, in many instances, its precious metals are purchased as investments. The very nature of purchasing something as an investment is that you seek to buy something that you can later resell at a higher price to make a profit. In addition, some of these purchases are not actually shipped to the purchaser but are stored in a depository, giving an even stronger indication that the products are purchased for the purpose of reselling and not for the personal enjoyment of the user. However, Monex argues that this does not constitute a reasonable belief that the product will be resold because they are not for *immediate* resale. In *Gieg*, the Ninth Circuit considered whether an automobile lease is a sale for the purpose of resale and stated that "the distinguishing characteristic of a 'sale for resale' is that the sale is made for the purpose of immediate resale." 407 F.3d at 1048. The court concluded that an automobile lease is not a sale for the purpose of resale because "[t]he customer who signs a retail automobile lease is the intended consumer of that vehicle. Neither the dealer nor the customer enters into a lease with the expectation that the vehicle or its parts will be promptly resold." *Id.* at 1049. The *Gieg* decision is controlling precedent, and therefore, while the Court appreciates the interpretation offered by Plaintiffs, it does not fit with this precedent. Plaintiffs do not claim, nor can they, that the Monex Account Representatives know when the purchased metals will be

---

**4.** The Court also notes that the court in *Gieg* concluded that it was uncontested that automobile sales were retail sales, so, while recognizing the policy behind the exemption, the Court did not provide guidance as to the appropriate analysis when it was contested whether a sale constituted a "retail sale." 407 F.3d at 1048.

**5.** In contrast, wholesalers "confine their sales to other wholesalers, retailers, and industrial or business purchasers in quantities greater than are normally sold to the general consuming public at retail." 29 C.F.R. § 779.328.

sold. While the metals may very well be sold promptly if the price for gold is rapidly increasing, the market is inherently unpredictable and the Account Representatives cannot be said to have "reasonable cause to believe" the goods are purchased for immediate resale. Therefore, the Court finds that Monex's sales are sales of goods not for resale.

## B. Recognized as Retail Sales in the Particular Industry

The third element of the "retail establishment" definition requires that 75 per centum of the annual dollar volume of sales of goods is recognized as retail sales in the "particular industry." 29 C.F.R. § 779.312. "In order to determine whether a sale or service is recognized as a retail sale or service in the 'particular industry' it is necessary to identify the 'particular' industry to which the sale or service belongs." 29 C.F.R. § 779.323. Here, the industry is precious metals sales. Then, when determining whether the employer's sales are recognized as retail in that industry, the Court looks to whether the industry at issue, as well as the particular employer, have a "retail concept." *English v. Ecolab, Inc.*, 2008 WL 878456, at *13, 2008 U.S. Dist. LEXIS 25862, at *41 (S.D.N.Y. 2008).

The Court first looks to evidence as to how persons in the industry and with knowledge of the industry view the establishment. *Acme Car & Truck Rentals, Inc. v. Hooper*, 331 F.2d 442, 446 (5th Cir.1964).

Such a determination must take into consideration the well-settled habits of business, traditional understanding and common knowledge. These involve the understanding and knowledge of the purchaser as well as the seller, the wholesaler as well as the retailer, the employee as well as the employer, and private and governmental research and statistical organizations. The understanding of all these and others who have knowledge of recognized classifications in an industry, would all be relevant in the determination of the question.

29 C.F.R. § 779.324.

Defendants presented evidence that Monex is not considered to be a commodities futures broker but a retail seller. *See Cronin v. Monex Deposit Co.*, Case No. SACV 08–1297 DOC (MLGx) (observing in *dicta* that Monex provided ample evidence that the Commodity Futures Trading Commission has analyzed Monex's trading programs and determined that they do not involve futures contracts); *Parada v. Superior Court*, 176 Cal.App.4th 1554, 1561, 98 Cal.Rptr.3d 743 (Cal.Ct.App.2009) (describing Monex as a precious metals dealer); 18 Cal. Admin. Code § 1599 (California State Board of Equalization, Business Taxes section, states, "Purchase of Coins and Bullion as Investment. Purchases of coins and bullion as investments are purchases at retail.")[6] Neither case deals with the FLSA, but they do provide some evidence as to how Monex is generally viewed. They also presented a City of Newport Beach Business Tax Certificate; California State Board of Equalization Seller's Permit; and a printout of the U.S. Mint website, which lists Monex as an "American Eagle and American Buffalo Gold Coin Program retailer." Carabini Decl. Exs. C–E. Finally, they presented evidence that Monex itself holds itself out

---

**6.** Defendants failed to cite a docket number or other locating factor for the additional opinion cited in *Monex v. Gilliam*, but the Court located it at Exh. G to the Decl. of A.

Chrystal. This order is less persuasive as it appears to be a proposed order adopted by the Court but drafted by Defendants' counsel.

to both customers as a retail entity. Carabini Decl. ¶¶ 8–9, 16.

Plaintiffs introduced conflicting evidence as to this issue. Plaintiffs provide evidence as to what the employees understood the operation of Monex's business to be. Former employee Don Kim's affidavit states that he understood that Monex was not at the end of the stream of distribution because customers, by the very nature of buying gold and precious metals as investments, intended to resell them for a profit. Decl. D. Kim ¶¶ 4–5.[7] In addition, former employee Thomas LaParne's affidavit expresses a similar understanding that Monex is not at the end of the stream of distribution because the precious metals are sold for investment purposes and will be resold as market conditions warrant. Decl. T. LaParne ¶¶ 17–18.[8] Plaintiffs also provide the testimony of Alan D. Biller, who states that he believes Monex "should be considered to be similar to an exchange or brokerage house an part of the national investment industry or community." Decl. A. Biller ¶ 7.[9] He also states that "investors who purchase commodities such as

gold and other precious metals for the most part make such investments for the purposes of subsequent resale or in contemplation of resale," and so he does not consider them to be the ultimate consumers. *Id.* ¶ 11. Plaintiffs also present Monex advertising on the website Traders' Resource, traders.com, in which Monex advertises its company under the category, "Brokerages." Decl. A. Van Broek, at Ex. J. Finally, in the sur-reply brief, Plaintiffs present legislative history for the tax exemption Monex receives under Cal. Rev. & Tax Code Section 6355. Among this history is that, during the passage of this exemption, lawyers for the Pacific Coast Coin Exchange, of whom Louis Carabini was then President,[10] stated, "all coin commodity trading transactions governed by [the bill], involve either purchases for ultimate 'resale,' or anticipate the future use of the silver bullion contained in coins as a raw material, or as a medium of exchange" and "coin commodity transactions are not retail sales; are sales for resale." Surreply at 3–4, Req. for Judicial Notice, Ex. 4.

The Court originally intended to deny summary judgment as to this issue be-

---

7. Defendants object to the testimony of Kim regarding whether the customers were the ultimate end users of the products and whether the customers intended to resell the products on the basis of Fed.R.Evid. 602, 802, and 701. Defs.' Obj. to Evidence at Obj. 4. However, as used as evidence of his understanding of the industry and Monex's business in general for the purpose of determining whether Monex's sales were viewed as retail sales, these objections are OVERRULED.

8. Defendants similarly object to the testimony of LaParne regarding whether the customers intended to resell the products on the basis of Fed.R.Evid. 602, 802, and 701. Defs.' Obj. to Evidence at Obj. 7, 8. However, these statements are admissible as evidence of LaParne's understanding of the industry and Monex's business for the purpose of determining whether Monex's sales were viewed as retail sales. The objections are OVERRULED.

9. Defendants argue, *inter alia,* that Biller's opinion that Monex is similar to an exchange or broker house is irrelevant and improper expert testimony. Defs.' Obj. to Evidence at Obj. 1, 2. However, as brokers are listed as non-retail in the regulations, it does go to the impression of whether persons knowledgeable of the industry consider the sales to be retail. Defendants' objections are OVERRULED except that their objection regarding his statement about the opinion of the California Board of Equalization is SUSTAINED for lack of foundation.

10. Carabini is now the President of Defendant Comco Management Corporation, the general partner of Monex Deposit Company, and submitted a declaration in support of Defendants' Motion.

cause the parties had submitted conflicting evidence as to whether the Monex sales are recognized as retail sales. This presents an interesting issue, as many of the cases presented on the Section 7(i) exemption were either not presented with, or do not discuss, competing evidence regarding the view of the industry. *See, e.g., Gieg,* 407 F.3d at 1048 (recognized nature uncontested); *Gatto v. Mortgage Specialists of Ill., Inc.,* 442 F.Supp.2d 529 (N.D.Ill.2006) (only cites evidence supporting one side of the issue, for which summary judgment granted); *Partida v. American Student Loan Corp.,* No. CV 07–0674–PHX–DGC, 2008 WL 190440 (D.Ariz. Jan. 18, 2008) (considering DOL regulations but not competing evidence of industry opinions). However, based on the Court's review of cases discussing the Section 7(i) exception, it appears to the Court that the determination of whether an establishment qualifies as "retail" is a matter of law to be determined by the Court. While genuine issues of material fact as to how the employer *operates* could very well preclude the issuance of summary judgment, the Court does not find that competing evidence regarding the views of persons regarding the industry precludes a finding of summary judgment as a matter of law on the issue.

The Court next turns to the "traditional understanding" of a retail concept, which looks to whether the business (1) sells goods to the general public; (2) serves the everyday needs of the community; and (3) is at the end of the stream of distribution and does not take part in the manufacturing process. *Gatto,* 442 F.Supp.2d at 540; 29 C.F.R. 779.318(a).[11] Monex clearly sells goods to the general public, as it advertises on television and a public website. It also does not take part in the manufacturing process.

A closer question is whether Monex serves the everyday needs of the community and is at the end of the stream of distribution. Courts lack a unified approach to what constitutes and how to interpret "everyday needs." *Compare Gatto,* 442 F.Supp.2d at 541 (regulation does not literally mean something a consumer uses every day; finding requirement applies to the service of finding and closing loans for purchases of new and existing residences); *Reich v. Cruises Only, Inc.,* 1997 WL 1507504 (M.D.Fla. June 5, 1997) (everyday needs does not mean used by everyone in the community on a daily basis; concluding that travel agency served everyday needs because they had become a common and convenient method of making travel plans); *Martin v. Refrigeration School, Inc.,* 968 F.2d 3 (9th Cir.1992) (evaluating in *dicta* whether education served everyday needs as an issue of whether it was "sufficiently basic to an individual's ability to participate in the community's social life"); *Kelly v. A1 Technology,* 2010 WL 1541585 (S.D.N.Y. Apr. 12, 2010) (everyday needs "seems to imply a degree of localization, that is, that the establishment serve principally, if not exclusively, the local needs of some identifiable community"); *Underwood v. NMC Mortg. Corp.,* 2009 WL 1269465 (D.Kan. May 6, 2009) (matching individuals with residential mortgage lenders would not qualify as serving the "everyday needs" of the public); *Schwind v. EW & Associates, Inc.,* 371 F.Supp.2d 560 (S.D.N.Y. May 25, 2005) (computer training "fundamental to function in today's

11. The regulations also contain a partial list of establishments which lack a "retail concept." 29 C.F.R. § 779.317. The list includes "[b]rokers, custom house; freight brokers; insurance brokers, stock or commodity brokers" and "investment counseling firms." *Id.* The corresponding partial list of establishments that have a "retail concept" include "fur shops, luggage stores, and cigar stores." 29 C.F.R. § 779.320.

society" and therefore served everyday needs); *Collins v. Horizon Training Centers, L.P.*, 2003 WL 22388448, at *7 (N.D.Tex. Sept. 30, 2003) (when concluding that computer training serves everyday needs, noting that more than half of all American households have a computer).

■ After considering the approaches of these courts, and recognizing that the term is one to which the DOL regulations give little guidance, the Court finds that "everyday needs" should be deemed to mean "basic" or "integral" needs of members in the community. While the purchase of precious metals may not initially sound like a basic need of members of the community, it is when looking to the two basic purposes for which buyers purchase precious metals-collecting the metals and investing the metals. These two purposes are integral uses of the community.[12]

■ As the Court has found that the goods are not for resale, the Court also finds that the goods are at the end of the stream of distribution in that there is no set plan for resale at the time it is being sold. It is not one peg in a chain of distribution such as a good owned by a wholesaler who will sell to a retailer or a good like a raw material that will be sold to a manufacturer.

The Court also finds that the 75% requirement has been met. While Monex does receive some income from interest, this amounts to less than 1% of Monex's revenue. Carabini Decl. ¶ 29.[13]

Whether an establishment is a "retail establishment" is a determination made on a case-by-case basis and is extremely dependent upon the functioning and structure of that establishment. Considering all of the evidence presented, including the competing views of the industry presented by the parties, the Court concludes that the precious metals sales by Monex are retail sales.

## C. Size, Type, and Intrastate Activity of the Establishment

Finally, Plaintiff argues that Monex does not qualify as a "retail or service establishment" because it does not meet the definition set forth in 29 C.F.R. § 779.337, which states:

(a) An establishment which is a "retail or service establishment" within the Act's statutory definition of that term (See discussion in Secs. 779.312 to 779.336) must, to qualify as an exempt retail or service establishment under section 13(a)(2) of the Act (See Sec. 779.301), meet both of the following tests:

(1) More than 50 percent of the retail or service establishment's total annual dollar volume of sales must be derived from sales of goods or services (or both) which are made within the State in which the establishment is located; and

(2) Either:

(i) The retail or service establishment must not be in an enterprise of the type described in section 3(s), or

---

12. The Court recognizes that financial industry products and services have frequently been held to lack a retail concept and that some are included in the DOL's regulations regarding businesses lacking a retail concept. However, these conclusions appear more likely based on the financial industry products' and services' inability to satisfy other requirements for a retail concept—that they are at

the end of the stream of distribution and recognized as a retail product in the industry.

13. Plaintiff objects to this statement in the Carabini Declaration on the basis that it lacks foundation and contains a legal or factual conclusion. These objections are OVERRULED.

(ii) If the retail or service establishment is in an enterprise of the type described in 3(s), it has an annual volume of sales (exclusive of excise taxes at the retail level which are separately stated) of less than $250,000.

29 C.F.R. § 779.337 interprets the now repealed Section 13(a)(2), and 29 C.F.R. § 779.337 interprets that section, so Plaintiffs argue that its requirements are encompassed within the definition of "retail or service establishment." However, Section 13(a)(2) section was an exemption intended to apply to small local retail establishments because those establishments did not impact the stream of interstate commerce sufficiently to warrant regulating their wage and hour payments. *English v. Ecolab, Inc.*, No. 06 Civ. 5672, 2008 WL 878456, at *2, n. 6 (S.D.N.Y. Mar. 31, 2008). As noted in *Ecolab*, Section 7(i) is intended to focus on the manner through which an employee is paid—commissions—rather than the employer's size or influence on interstate commerce. "Although courts interpreting the current § 7(i) exemption rely on language in the former § 13(a)(2) exemption, the two provisions were designed to address fundamentally different wage and hour concerns." *Id.* Looking at 29 C.F.R. § 779.337 with·this understanding, it is clear that, while the regulation defines the *exemption* of 13(a)(2), it does not constrain the *definition* of "retail or service establishment," which was but one element of the exemption. This is confirmed by the plain reading of the regulation, which states that establishments within the statutory definition of "retail or service establishment" must, to qualify as exempt under Section 13(a)(2), meet additional requirements. Therefore, the Court finds that 29 C.F.R. § 779.337 does not direct or otherwise constrain the definition of "retail or service establishment."

## IV. DISPOSITION

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED and finds that Monex is a "retail establishment" within the meaning of the Section 7(i) exemption.

IT IS SO ORDERED.